**Anthony ROSSI et al., Plaintiffs,**

v.

**Harold BROWN, Secretary of Defense, et al., Defendants.**

**Civ. A. No. 78–2346.**

United States District Court, District of Columbia.

March 20, 1979.

---

J. Stanley Pottinger, Randy M. Mott,[*] Troy, Malin & Pottinger, Washington, D. C., for plaintiffs.

William H. Briggs, Asst. U. S. Atty., Civ. Div., Washington, D. C., for defendants.

## MEMORANDUM

FLANNERY, District Judge.

This matter comes before the court on cross-motions for summary judg-

ment. The material facts are undisputed. The issue presented is readily stated: whether a Base Labor Agreement ("BLA") entered into between the United States and the Republic of the Philippines which provides for the preferential hiring of local nationals at United States military bases in the Philippines is a "treaty" within the meaning of 5 U.S.C. § 7151 note (1976), which bans discrimination against American citizens at U.S. military bases overseas "[u]nless prohibited by treaty." Restated more generally, the issue is whether the word "treaty" in 5 U.S.C. § 7151 note means a treaty in the constitutional sense—an agreement between nations approved by the Senate under its "advice and consent" powers—or in the broader international sense of any binding agreement between the governments of two nations. The court concludes that the latter interpretation is proper on the facts of this case, and will enter partial summary judgment for the defendants.

### FINDINGS OF FACT

The plaintiffs are citizens of the United States who currently reside in the Philippines. The defendants, Harold Brown and W. Graham Claytor, Jr., are respectively the Secretary of Defense and the Secretary of the Navy. As of March 14, 1978, four of the plaintiffs were employed by the defendants as game room managers at Special Services, U.S. Naval Station Subic Bay, in the Republic of the Philippines. On that date they were notified that the position of game room manager would be converted to a "local national" position which could only be filled by Philippine citizens. This conversion was ordered pursuant to the Base Labor Agreement of 1968, T.I.A.S. No. 6542, Article I, which provides that:

> The United States Armed Forces in the Philippines shall fill the needs for civilian employment by employing Filipino citizens, except when the needed skills are found in consultation with the Philippine Department of Labor, not to be locally available, or when otherwise necessary

* Main Counsel.

for reasons of security or special management needs, in which case United States nationals may be employed.

The Base Labor Agreement has not been approved by the Senate under its "advice and consent" powers set forth in Article II, Section 2, Clause 2 of the United States Constitution. It was, however, negotiated because of an arrangement between the United States and the Republic of the Philippines providing for the establishment and maintenance of U.S. military bases in the Philippines. This negotiation took place pursuant to an Act of Congress passed in 1944, which provides in pertinent part:

> After negotiation with the President of . . . the Philippines, . . . the President of the United States is authorized by such means as he finds appropriate to withhold or to acquire and to retain such bases, necessary appurtenances to such bases, and the rights incident thereto, . . . as he may deem necessary for the mutual protection of the Philippine Islands and of the United States.

22 U.S.C. § 1392 (1976). This statutory authorization led to an initial Military Base Agreement in 1947, T.I.A.S. No. 1775, which has been the subject of periodic renegotiation, and the Base Labor Agreement of May 27, 1968, T.I.A.S. No. 6542.

Upon hearing of their proposed termination, plaintiffs Rossi, Bumgarner, Perry and Frierson instituted administrative proceedings at the Subic Bay Naval Station, contending that their proposed termination constituted unlawful discrimination on the basis of citizenship, actionable under Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e *et seq.* (1976). They also maintained that the termination flatly violated Section 106 of Public Law 92–129, 5 U.S.C. § 7151 note (1976) [hereinafter referred to for convenience as "Section 106"], which provides in pertinent part that:

> Unless prohibited by treaty, no person shall be discriminated against by the Department of Defense or by any officer or employee thereof, in the employment of civilian personnel at any facility or any installation operated by the Department of Defense in any foreign country because such person is a citizen of the United States or is a dependent of a member of the Armed Forces of the United States . . . . .

Local officers at the Subic Bay Station rejected the plaintiffs' complaint because they concluded that neither they nor the Department of the Navy had the authority unilaterally to modify the Base Labor Agreement. The four plaintiffs named above were subsequently fired ahead of schedule pursuant to a Reduction in Force (RIF). This early termination is the subject of a retaliation claim by the plaintiffs, which is not before the court in the present motions. The defendants correctly note that all of the plaintiffs' proposed findings of fact which relate to that termination and the retaliation claim are immaterial in the present posture of the case.

After notice of their proposed early termination, the plaintiffs brought this action on December 13, 1978, seeking a Temporary Restraining Order enjoining the defendants from firing them and barring them from the base. The court granted a temporary restraining order to permit adequate consideration of the matter, and then denied plaintiffs' Motion for a Preliminary Injunction on December 22, 1978. The court subsequently ordered cross-motions for summary judgment on the legality of Article I of the Base Labor Agreement and its status within the meaning of Section 106.

## CONCLUSIONS OF LAW

### I. The Parties'·Contentions

The plaintiffs' position is that Congress used the term "treaty" in Section 106 with full knowledge of its meaning and the intention that it be construed in its constitutional sense. They ask the court to examine the plain meaning of the term, recognizing that although no distinction is drawn between "treaty" and "executive agreement" for purposes of international law, a clear distinction does exist under United

States law, which the Congress must be presumed to have employed. This position, they argue, is supported by the legislative history of Section 106, by the legislative history of contemporaneous legislation which employed the term "treaty", and by interpretations of the General Accounting Office and, until 1977, of the Department of State. The plaintiffs also contend that Congress, by enacting various laws which prohibit discrimination, has expressed its intent to prevent discrimination against American citizens at overseas military bases. Finally, plaintiffs argue that the Supremacy clause prevents the BLA from overriding conflicting Congressional enactments unless the BLA is a treaty in the constitutional sense.

The defendants maintain that although the Base Labor Agreement was never submitted to the Senate for "advice and consent" and is not a treaty in the narrow constitutional sense, it is a valid and binding international obligation of the United States, entered into pursuant to congressional authority, and thus is a "treaty" within the meaning of Section 106. They reason that the Base Labor Agreement falls within the definition of "treaty" under international law, and that other courts, particularly the Supreme Court in *B. Altman & Co. v. United States,* 224 U.S. 583, 32 S.Ct. 593, 56 L.Ed. 894 (1912), have held agreements between the United States and another nation to be "treaties" within the meaning of certain statutes, even without the Senate's advice and consent. According to the defendants, the legislative history of Section 106 is so sparse, and the wording so awkward, that it would be a serious mistake to conclude that Congress intended to upset numerous international agreements by a statute so hastily passed. They point to the total absence of any indication of intent to upset existing international agreements, even though numerous agreements similar to the BLA were in force between the United States and other nations at the time Section 106 was passed. Finally, the defendants stress the need for the court to employ sound principles of judicial deference when interpreting the term "treaty" in order to avoid upsetting existing relations with foreign nations and to refrain from interfering with the executive branch's conduct of foreign affairs. After an examination of the pertinent statutes involved here, and the legislative history of Section 106, the court is convinced that the defendants' position, particularly in view of the absence of a showing of persuasive legislative history, is correct.

## II. "Treaty"—Generic and Constitutional Meanings

The broad meaning of the word "treaty", as the term is customarily used, is:

> any international agreement concluded between states in written form and governed by international law, whether embodied in a single instrument or in two or more related instruments and whatever its particular description . . . .

Vienna Convention of the Law of Treaties of May 23, 1969, Art. 2(1)(a), *compiled at* 63 Am.J.Int'l L. 875 (1969). *See also B. Altman & Co. v. United States,* 224 U.S. 583, 600–01, 32 S.Ct. 593, 56 L.Ed. 894 (1912); L. Henkin, *Foreign Affairs and the Constitution* 142 (1972). Thus, the term implies a binding agreement between nations which governs some aspect of the relations between them. The parties do not dispute that the Base Labor Agreement falls within this definition of treaty, because it was entered into in 1968 by the United States and the Republic of the Philippines after joint negotiation and drafting.

The United States Constitution suggests a narrower definition of the term "treaty".[1] Article II, Section 2, Clause 2, in delineating the powers of the President, states that:

> He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . .

Although this clause might suggest that the President cannot enter into agreements

---

1. "The Constitution does not define 'Treaties': the Framers, apparently, saw no need to define what was well known to international law and practice." L. Henkin, *supra,* at 140.

with other nations without the advice and consent of the Senate, the actual evolution of the relationship between the Executive and Legislative branches, together with a recognition of the President's powers in managing the foreign relations of the United States, have led to a recognition of the use of agreements between governments without the advice or consent of the Senate. *See generally* L. Henkin, *supra,* at 173–88.[2] It is presently beyond dispute that the President may enter into such agreements, known as executive agreements, and that such agreements are binding upon the United States. *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). An executive agreement, it is understood, is a "treaty" within the broad generic sense set forth above, but is not a "treaty" in the sense set forth in the Constitution.

The Base Labor Agreement is not, strictly speaking, an "executive agreement." It is what one commentator has labelled a "Congressional-Executive Agreement," L. Henkin, *supra,* at 173, because Congress "authorized the President in advance to negotiate and conclude agreements on [a] particular subject[ ]." *Id.; see* 22 U.S.C. § 1392 (1976) (President authorized to acquire and maintain bases in Philippines "by such means as he finds appropriate"). Hen-

kin notes that the constitutional basis of such agreements is unclear, but goes on to state:

> Neither Congresses nor Presidents nor courts have been troubled by these conceptual difficulties and differences. Whatever their theoretical merits, it is now widely accepted that the Congressional-Executive agreement is a complete alternative to a treaty: the President can seek approval of any agreement by joint resolution of both houses of Congress instead of two-thirds of the Senate only. Like a treaty, such an agreement is the law of the land, superseding inconsistent state laws as well as inconsistent provisions in earlier treaties, in other international agreements or acts of Congress.

L. Henkin, *supra,* at 175 (footnotes omitted). *Compare id.* at 176–84 (discussion of "sole" executive agreements). Of course, it still can be maintained that Congress withdrew in 1973 a portion of that broad power which it granted to the President in the Act of 1944. Here again the question turns on the intent of Congress as gauged by an examination of the legislative history. *See* Restatement (Second) Foreign Relations Law of the United States § 145 (1965).[3]

It is in this context that the court must determine whether Section 106, which prevents discrimination against American citizens "unless prohibited by treaty" controls over and invalidates Article I of the Base Labor Agreement of 1968. If Congress in-

---

**2.** Henkin notes that:

> The Constitution does not expressly confer authority to make international agreements other than treaties, but executive agreements, varying widely in formality and importance, have been common from our early history.

L. Henkin, *supra* at 173 (1972).

**3.** The Restatement (Second) contains the following provision:

> § 145. Effect of Subsequent Act of Congress on International Agreement
> (1) An act of Congress enacted after an international agreement of the United States becomes effective, that is inconsistent with the agreement, supersedes it as domestic law of the United States, *if the purpose of Congress to supersede the agreement is clearly expressed.*

> (2) The superseding of the agreement as domestic law of the United States by subsequent act of Congress *does not affect the international obligations of the United States under the agreement.*

(emphasis added). Comment (b) to Section 145 states:

> [t]he courts do not favor repudiation of an earlier international agreement by implication and require clear indications that Congress, in enacting subsequent inconsistent legislation, meant to supersede the earlier agreement.

The court recognizes that the BLA has no domestic effect, so that part (1) of Section 145 is not directly applicable. The approach, however, is directly on point: the purpose of Congress must be explored to overcome a reluctance to overturn international agreements by implication.

tended the word "treaty" to encompass only treaties entered into with the advice and consent of the Senate, Section 106 would control over the BLA. If Congress intended the broader term to apply, then the Base Labor Agreement provision for preferential hiring of foreign nationals is controlling.

### III. Plain Meaning and Legislative History

The court turns, as it must, first to the words of the statute themselves and any indications of Congressional intent reflected in the legislative history of Section 106.

The plaintiffs contend that the mere use of the word "treaty" in Section 106 disposes of the matter, because the term "treaty" "is normally used to indicate an international agreement that is to be or has been brought into force with respect to the United States by and with the advice and consent of the Senate in conformity with Article II of the Constitution." Plaintiffs' Exhibit R (1975 letter of James Boyd, Acting Ass't Legal Advisor to State Department). This contention is plausible, but several factors argue against it. First, even the sources cited by the plaintiffs state that the term treaty "normally" or "most frequently" is used to refer to a treaty produced with the advice and consent of the Senate. They do not state that it invariably carries such a meaning. Second, several courts have held that executive agreements were "treaties" within the meaning of an Act of Congress. In *B. Altman & Co. v. United States,* 224 U.S. 583, 32 S.Ct. 593, 56 L.Ed. 894 (1912), the Supreme Court held that an executive agreement between the United States and France was a "treaty" within the meaning of the Circuit Court of Appeals Act, so that a direct appeal could be had to the Supreme Court. The Court noted that the agreement was an international compact between two sovereign nations, and that

> If not technically a treaty requiring ratification, nevertheless it [the agreement] was a compact authorized by the Congress of the United States, negotiated and proclaimed under the authority of its President. We think such a compact is a

treaty under the Circuit Court of Appeals Act, . . . .

224 U.S. at 601, 32 S.Ct. at 597. More recently, the United States Court of Appeals for the Eighth Circuit held that the Philippine Military Bases Agreement, which was drafted pursuant to the same statutory authority as the BLA, was a treaty within the meaning of a Supreme Court decision providing that the extradition of a defendant in a criminal case could only be valid if authorized "by treaty or Act of Congress." *Williams v. Rodgers,* 449 F.2d 513 (8th Cir. 1971), *cert. denied,* 405 U.S. 926, 92 S.Ct. 976; 30 L.Ed.2d 799 (1972); *see Valentine v. United States,* 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936). Thus, the mere use of the word "treaty" is not dispositive.

This conclusion is buttressed by an examination of the context in which the word "treaty" appears. Section 106 provides that "[u]nless *prohibited* by treaty, no person shall be discriminated against . . . ." The defendants point out quite correctly that the term "prohibited" in this context is awkward, at best. It would have been more appropriate to state that "unless provided by treaty", or "unless permitted by treaty", no discrimination could occur. Whether the use of "prohibited" is an indication of sloppy draftsmanship or a more subtle intention of Congress cannot be ascertained at this point. The court does consider this confusing language significant, however, in evaluating the plaintiffs' contention that Congress chose its words carefully and meant just what it said when it used the word "treaty".

Nor does the legislative history of Section 106 support the plaintiffs' position. As the defendants correctly note, Section 106 was part of Public Law 92–129, an act which dealt extensively with military pay, the selective service, and authorization of active duty strengths for fiscal year 1972. Congress devoted extensive discussion to these topics, while paying almost no attention to what became Section 106. *See* H.Rep.No. 433, 92d Cong., 1st Sess. (1971); S.Rep.No. 93, 92d Cong., 1st Sess. (1971) U.S.Code Cong. & Admin.News 1971, p. 1439. The

parties have not directed the court to any discussion of the import of the term "treaty", and the court has not located any on its own. Indeed, the only significant discussion of the provision indicates that Congress was more concerned with discrimination on bases in Europe which had been occurring in the absence of a Base Labor Agreement:

> The purpose of the Senate provision is to correct a situation which exists at some foreign bases, primarily in Europe, where discrimination in favor of local nationals and against American dependents in employment has contributed to conditions of hardship for families of American enlisted men whose dependents are effectively prevented from obtaining employment.

H.R.Rep.No. 433, *supra,* at 31 (Conference Committee Report) *See* S.Rep.No. 93, *supra,* at 23 (similar statement) U.S.Code Cong. & Admin.News 1971, p. 1508. Other references to proposed section 106 merely state that it would "[p]rohibit discrimination against American citizens and their dependents in employment on overseas military bases." *Id.* at 2, 6, 41, U.S.Code Cong. & Admin.News 1971, p. 1440. At the time Public Law 92–129 was passed, the NATO Status of Forces Agreement contained no provision for hiring local nationals over, American citizens. Defendants' Cross Motion for Partial Summary Judgment at 11. The debates on the floor reflect a concern with matters other than discrimination pursuant to Base Labor Agreements. *E. g.,* 117 Cong.Rec. 13919 (quote similar to provision in Conference Report); 16126 (remarks of Sen. Cook) (wives of enlisted men unable to secure work permits although many foreign nationals are hired); 16128 (remarks of Sen. Schweiker) (expressing concern over command decisions to hire local nationals in Germany although not required to do so).[4]

---

4. In their supplemental memorandum, the plaintiffs maintain that "abundant" evidence indicates that Congress explicitly intended to abrogate Executive Agreements which promoted discrimination against United States citizens on overseas bases. A review of the passages from the floor debate indicates a paucity, rather than an abundance, of evidence to support the plaintiffs' position. The Senate floor debates of May 11 and May 20, 1971 contain perhaps the most significant discussions of the antidiscrimination amendment. On May 11, 1971 Sen. Schweiker began his discussion of the issue by referring to a letter drafted by Brig. Gen. Charles Phipps, which discusses the employment of U.S. tourists and dependents. The letter encourages Exchange System employers to hire local nationals, because of their lower wage costs and turnover rate. 117 Cong. Rec. 14394–95 (May 11, 1971) Senator Schweiker returned to the subject several minutes later, discussing discrimination against servicemen, but focusing on the Phipps letter. He did not mention an "agreement" for local national preference. *Id.* at 14397.

The plaintiffs nonetheless contend that the Senate, upon returning to the subject of Section 106 on May 20, 1971, explicitly discussed the BLA. *See* Plaintiffs' Supplemental Memorandum, at 3. These comments appear to refer to the plight of young wives of lower ranking servicemen who could not accompany their husbands to Europe except by coming on a tourist visa. The remarks of Senators Cook and Hughes reveal nothing about Base Labor Agreements or the meaning of "treaty" in Section 106. The excerpts cited by the plaintiffs are revealing:

> . . . it was my understanding that there was an *agreement,* through the NATO organization, *that these young wives, because they were there on tourist visas, could not get a work permit under any circumstances.*

117 Cong.Rec. 16126 (May 20, 1971) (remarks of Sen. Hughes) (emphasis added).

The next passage cited by the plaintiffs reads as follows:

> Another major point is that there should be a renegotiation of the Status of Forces Agreement (SOFA)
>
> Portions of SOFA could and should be changed to allow dependent wives to take many of the jobs now available solely to local nationals, he maintains.

*Id.* at 16128 (read into the record by Sen. Schweiker, quoting from an article which appeared in *Stars and Stripes*). The very next passage, which the plaintiffs neglected to quote, goes on to say:

> Mr. President, let me interject there that we have done some research and find that in Germany particularly, that is not the case. Our commanding general who is head of the European Exchange System, Gen. Charles H. Phipps, in a memo of February 1971, issued this edict across Europe to all the stores and services in the exchange system:
>
> [quoting Phipps letter] For the reasons outlined above, I desire that the European Exchange System elements in the months ahead emphasize recruitment of local nationals and sharply deemphasize the utilization of United States dependents or tourists.
>
> [by Sen. Schweiker] Here is an American general saying that when the GI's go to their

Thus, the court concludes that neither the plain language of Section 106 nor the legislative history of the Act supports the plaintiffs' contention that Congress intended to ban all discrimination on military bases abroad, even when pursuant to an agreement between nations. In fact, the legislative history would argue against such an interpretation.

The plaintiffs nonetheless argue that the "legislative context" of Public Law 92–129 supports their position, because other laws enacted by Congress during the same time period make a clear distinction between "treaty" in the narrow constitutional sense and the broader definition. Thus, the 92d Congress also enacted the Case Act, 1 U.S.C. § 112b, which requires the executive to transmit to Congress "the text of any international agreement, *other than a treaty*, to which the United States is a party . . . ." *See also* S.Rep.No. 632, 92d Cong., 2d Sess. (1972) (Committee Report for S.Res. 214, stating that agreements with Portugal or Bahrain for military bases should be submitted as treaty for advice and consent, rather than as executive agreement). These enactments do reflect a concern in Congress that the President was conducting foreign policy without adequately consulting the Senate. They do not, however, support the plaintiffs' contention that Section 106 of Public Law 92–129 must be read *in pari materia* with contemporaneous legislation.

First, the cases relied upon by the plaintiff involved closer similarities in language than the use of a single word. *See, e. g., United States v. Stewart*, 311 U.S. 60, 64, 61 S.Ct. 102, 105, 85 L.Ed. 40 (1940) (two acts passed at different times dealt "with precisely the same subject matter . . .

the scope of the tax exemption afforded farm loan bonds"). In *Erlengaugh v. United States*, 409 U.S. 239, 243–44, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972), the Supreme Court stated that

> The rule of *in pari materia* —like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context. Thus, for example, a 'later act can · . . . be regarded as a legislative interpretation of [an] earlier act . . . .'

The present case deals with two statutes which do not deal with the same subject matter. Both the Case Act and the debate over Senate Resolution 214, it is true, dealt with Congressional concern over the Executive Branch's increasing use of executive agreements rather than submitting international agreements to the Senate. Section 106, however, insofar as the court can determine from the legislative history, dealt with discrimination against the families of American servicemen, particularly in Europe. If the Congress was attempting to make Section 106 another front in the war against executive agreements, as plaintiffs suggest, there should have been at least *some* indication of that intent in the legislative history. The court therefore rejects the plaintiffs' suggestion that the word "treaty" be interpreted in the constitutional sense just because it was so employed in roughly contemporaneous legislation.

## IV. Judicial Deference in the Area of Foreign Affairs

The court notes that at the time Section 106 was passed, twelve international agree-

canteen or service post exchange and spend their money, they do not even have the right to have their wives working there because we should give those jobs to local nationals. 117 *Cong.Rec.* 16128 (May 20, 1971) (emphasis added).

· The remaining comments cited by the plaintiffs are mere precatory language about discrimination.

Finally, the defendants correctly state that Mr. Schweiker, in continuing his discussion,

reviewed the plight of lower level servicemen in Europe and stated that "[j]ust a simple Executive order would change this." 117 Cong.Rec. 16132 (May 20, 1971).

Thus, contrary to the plaintiffs' assertions, the legislative history of Section 106 is far from clear, and it can in fact be credibly argued that Congress had in mind only those instances of discrimination which resulted from the caprice of individual officers.

ments were in effect which contained provisions for hiring preference for local nationals at overseas military bases. None of these agreements had been submitted for the advice and consent of the Senate. Defendants' Cross-Motion for Partial Summary Judgment at 12 n. 11. Two additional agreements have been added since 1971 with local national preference provisions. It is beyond dispute that these agreements were entered into after negotiations, with the understanding that the hiring of local nationals when possible would be part of the *quid pro quo* for the retention by the United States of military bases in the host country. The interpretation of Section 106 urged by the plaintiffs would invalidate the preferential hiring provisions of these treaties, with uncertain effects in the conduct of foreign affairs.[5] The existence of these agreements, and their scope, counsels the court in two ways. First, it suggests that the court should not lightly infer a Congressional intent to overturn portions of fourteen international agreements in the absence of *any* legislative history suggesting such an intent. Second, it persuades the court to act cautiously in an area fraught with sensitivity and affecting foreign affairs of the United States.

The court does not agree with the suggestion put forth by the defendants, however, that this controversy is nonjusticiable. Defendants' Cross-Motion for Summary Judgment at 13–14, *citing Diggs v. Richardson*, 180 U.S.App.D.C. 376, 555 F.2d 848 (1976); *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). This case does not require the court to interpret the terms of a treaty or to meddle in areas of foreign import which have been traditionally regarded as the province of the President. It involves the construction of an Act of Congress, a task which necessitates an evaluation of the wording of the statute, the legislative history, and the applicable case law and canons of construction. The impact on foreign affairs of such construction does not render the case nonjusticiable. It does, however, persuade the court that the construction urged by the plaintiffs would have to be supported by a far firmer basis than that existing here.

## V. Applicability of Title VII to this Action

The court concludes that the term "treaty" in Section 106 should be construed to mean a treaty as the term is defined under international law—an agreement between nations. This being the case, the Base Labor Agreement is a valid exercise of the President's authority to retain bases "by such means as he finds appropriate." 22 U.S.C. § 1392 (1976). The specific provision that the Department of Defense may discriminate on the basis of citizenship if provided by treaty therefore controls over the general provisions of Title VII. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). The court need not address the question whether Title VII applies to citizenship as well as to national origin.

The court's holding regarding Title VII does not, however, apply to those portions of the plaintiffs' case based upon allegations of retaliation. The retaliation issues are not before the court at this time, and no statute provides that retaliation may be engaged in. It appears to the court, however, that the reprisal charges might not be ripe for review. The reprisal complaint challenging the plaintiffs' early termination was filed on November 15, 1978. The court is entirely willing to adjudicate this issue, but it must be satisfied that the strict "jurisdictional prerequisites", which give the

---

**5.** It is true that the only BLA actually before the court concerns the Republic of the Philippines, and that the court can make no factual findings regarding the extent of local national hiring or foreign policy implications of similar agreements with other nations. Nonetheless, if the court affirmed the plaintiffs' position and

was upheld on appeal, the court's construction of Section 106 would perforce have an impact on other agreements. Counsel for the plaintiffs acknowledged this impact at the hearing in this matter, agreeing that a decision by this court would constitute "persuasive" authority for similar challenges.

court subject matter jurisdiction, have been met. *See* 42 U.S.C. § 2000e–16(c) (1976) (civil action may be filed after 180 days have expired without agency action on administrative complaint); *Richardson v. Wiley*, 186 U.S.App.D.C. 309, 311, 569 F.2d 140, 142 (1977) (Title VII time limitations are jurisdictional). Therefore, the court will order the parties to appear at a status call ten days from the date of this order to clarify the status of plaintiffs' retaliation claim.

## CONCLUSION

The court holds that on the facts of this case, the term "treaty" in Section 106 of Public Law 92–129, 5 U.S.C. § 7151 note (1976), means any agreement between nations. The court also holds that Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.* is therefore inapplicable to this action. Partial summary judgment on these issues will be entered for the defendants. The plaintiffs' remaining discovery motions, having been rendered nugatory by the above holdings, will be denied.