**Anthony M. ROSSI et al., Appellants,**

**v.**

**Harold BROWN, Secretary of Defense et al., Appellees.**

**No. 79–1485.**

Rehearing Denied Dec. 18, 1980.

United States Court of Appeals, District of Columbia Circuit.

Argued 15 April 1980.

Decided 15 Sept. 1980.

Rehearing Denied Dec. 18, 1980.

Randy M. Mott, Washington, D.C., with whom J. Stanley Pottinger, Warren Dennis, and Carolyn Dye, Washington, D.C., were on brief, for appellants.

Martha P. Rogers, Asst. U.S. Atty., Washington, D.C., with whom Carl S. Rauh, U.S. Atty. at the time the brief was filed, John A. Terry, Michael W. Farrell and William H. Briggs, Jr., Asst. U.S. Attys. and Laurence Storch, Atty., Dept. of State, Washington, D.C., were on brief, for appellees.

Before McGOWAN and WILKEY, Circuit Judges, and DAVIES *, Senior United States District Judge for the District of North Dakota.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

■ Section 106 of Public Law No. 92–129 prohibits discrimination against United States citizens in the employment of civilian personnel on United States military bases overseas, unless such discrimination is permitted by "treaty." [1] This case presents the narrow question of whether the Base Labor Agreement of 1968 between the United States and the Republic of the Philippines,[2] which provides for preferential hiring of local nationals at United States military bases in the Philippines, is a "treaty" within the meaning of section 106.

■ Resolution of this question turns on whether the word "treaty" set forth in the statute is intended to refer only to interna-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. See Act of 28 Sept. 1971, Pub.L.No. 92–129, § 106, 85 Stat. 348, 355 (codified at 5 U.S.C. § 7151 note (1976)). For text of the provision, see text accompanying note 7 infra.

2. The official title of the agreement is the Agreement Relating to the Employment of Phil-

ippine Nationals in the United States Military Bases in the Philippines, 27 May 1968, United States–Philippines, [1968] 19 U.S.T. 5892, T.I.A.S. No. 6542, reprinted in Joint Appendix (J.A.) at 170. The agreement more commonly is known as the Base Labor Agreement, and that usage will be followed here. For text of the relevant portion of the agreement, see text accompanying note 5 infra.

tional agreements entered into by the President with the advice and consent of two-thirds of the Senate or whether it refers in a broader sense to any international agreement entered into between the United States and the governments of other nations. The district court concluded that the latter interpretation was correct and accordingly entered summary judgment for the Government.[3] We reverse, finding on the basis of the plain language of the statute and the legislative history that the term "treaty" was used in the sense set forth in article II of the Constitution–that is, an international agreement made by the President with the advice and consent of two-thirds of the Senate.

## I. BACKGROUND

The essential facts are not in dispute; we review them briefly here.[4]

Article 1 of the Base Labor Agreement of 27 May 1968 between the United States Government and the Republic of the Philippines provides:

> The United States Armed Forces in the Philippines shall fill the needs for civilian employment by employing Filipino citizens, except when the needed skills are found, in consultation with the Philippine Department of Labor, not to be locally available, or when otherwise necessary for reasons of security or special management needs, in which cases United States nationals may be employed.[5]

In March 1978 four of appellants, who are United States citizens residing in the Philippines, were informed that pursuant to this agreement their positions as gameroom managers at the United States Naval Station, Subic Bay, in the Republic of the Philippines, thereafter would be filled only by Philippine citizens. Appellants subsequent-ly filed an administrative complaint with an Equal Employment Opportunity Counselor challenging the validity of this action.

After failing to prevail at the administrative level, appellants on 13 December 1978 filed a complaint in the United States District Court alleging that the provision set forth in the Base Labor Agreement for hiring Filipino citizens in preference to United States citizens plainly contradicts section 106, Public Law 92–129 (Hughes–Schweiker amendment).[6] Section 106 pro-vides in pertinent part:

> *Unless prohibited by treaty*, no person shall be discriminated against by the Department of Defense or by any officer or employee thereof, in the employment of civilian personnel at any facility or installation operated by the Department of Defense in any foreign country because such person is a citizen of the United States or is a dependent of a member of the Armed Forces of the United States.[7]

Whether the preferential hiring mandate of the Base Labor Agreement is nullified by the qualified ban on employment discrimination against United States citizens set forth in section 106 necessarily depends upon the construction accorded to the word "treaty." Appellants contended below that Congress used the word "treaty" in section 106 in the sense set forth in article II of the Constitution: an international agreement made by the President with the advice and consent of two-thirds of the Senate. Under this construction, the parties agree, the Base Labor Agreement is not a treaty. The President never submitted the agreement to the Senate for ratification. Rather, it was negotiated by the President pursuant to a congressional authorization of 1944 to use "such means as he [the President] finds appropriate" to acquire and retain military

---

**3.** *See Rossi v. Brown,* 467 F.Supp. 960 (D.D.C. 1979).

**4.** *See id.* at 961-62.

**5.** Base Labor Agreement, 27 May 1968, United States–Philippines, art. I, [1968] 19 U.S.T. 5892, 5892-93, T.I.A.S. No. 6542, *reprinted in* J.A. at 170, 170-71.

**6.** Act of 28 Sept. 1971, Pub.L.No. 92–129, § 106, 85 Stat. 348, 355 (codified at 5 U.S.C. § 7151 note (1976)).

**7.** *Id.* (emphasis added).

bases in the Philippines.[8] The district court, however, agreed with the Government's contention that Congress intended the scope of the term "treaty" to encompass any binding agreement entered into between the United States and other nations. Accordingly, the court held that the Base Labor Agreement of 1968 was a "treaty" for purposes of section 106.

We reverse. Customary usage of the term "treaty" in the United States and the legislative history of section 106 persuade us of the validity of appellants' position.

## II. ANALYSIS

### A. Customary Usage in the United States

■ Under principles of international law, the word "treaty" ordinarily is used to refer to "an international agreement concluded between states in written form and governed by international law, whether embodied in a single instrument or in two or more related instruments and whatever its particular designation."[9] The designation of "treaty" under international law thus encompasses within its scope all binding agreements entered into between nations regardless of the manner by which these agreements are brought into force.

Under the United States Constitution, the term "treaty" has a more specific and restricted meaning. Article II, section 2, clause 2 of the Constitution provides that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."[10] It is without question that the President may enter into binding agreements with other nations without the advice and consent of the Senate,[11] and these types of agreements commonly are called "executive agreements."[12] Executive agreements are "treaties" under established canons of international law, but not under article II of the Constitution.

This distinction between treaties and other forms of international agreements is followed in the draft Restatement of the Foreign Relations Law of the United States. Section 302 of the Restatement provides:

§ 302. Definitions: Law of the United States

(a) "Treaty" means an international agreement made by the President with the advice and consent of the Senate, two-thirds of the Senators present concurring.

(b) Other international agreements, sometimes collectively referred to as "international agreements other than treaties," include "executive agreements pursuant to treaty," "Congressional–executive agreements [i. e., executive agreements pursuant to con-

---

**8.** The relevant portion of the Act provides: "After negotiation with the President of the . . . Philippines . . ., the President of the United States is authorized by such means as he finds appropriate to withhold or to acquire and to retain such bases, necessary appurtenances to such bases, and the rights incident thereto." Act of 29 June 1944, ch. 322, § 2, 58 Stat. 625, 626 (codified at 22 U.S.C. § 1392 (1976)). Pursuant to this statutory authorization, the United States and the Philippines entered into the Military Bases Agreement of 1947, United States–Philippines, 61 Stat. 4019, T.I.A.S. No. 1775, which has been the subject of periodic renegotiation, as well as the Base Labor Agreement, 27 May 1968, United States–Philippines, [1968] 19 U.S.T. 5892, T.I.A.S. No. 6542, reprinted in J.A. at 170.

**9.** Vienna Convention on the Law of Treaties, 22 May 1969, art. 2(1)(a), reprinted in 63 Am.J. Int'l L. 875, 876 (1969). As the drafters of the Restatement of the Foreign Relations Law of the United States state, "[I]nternational law does not distinguish between agreements designated as 'treaties' and other agreements." Restatement of the Foreign Relations Law of the United States, Introductory note 3, at 74 (Tent. Draft 1 Apr. 1980).

**10.** U.S.Const. art. II, § 2, cl. 2.

**11.** See, e.g., United States v. Belmont, 301 U.S. 324, 330–32, 57 S.Ct. 758, 760, 81 L.Ed. 1134 (1937); United States v. Curtiss–Wright Export Corp., 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936); B. Altman & Co. v. United States, 224 U.S. 583, 600–01, 32 S.Ct. 593, 596, 56 L.Ed. 894 (1912).

**12.** L. Henkin, Foreign Affairs and the Constitution 173 (1972).

gressional authorization] and "sole executive agreements." [13]

Thus under United States law, "treaties" normally are thought of as one specific category of international agreements requiring a particular procedure and having a particular status. According to this usage, the *Base Labor Agreement* at issue is an executive agreement, or more specifically, a "Congressional–executive agreement" [14] –that is, an international compact concluded by the President pursuant to congressional authorization to use "such means as . . appropriate" to acquire and retain military bases in the Philippines–but not a "treaty."

In declining to apply this interpretation to section 106, the district court in part relied upon *B. Altman & Co. v. United States.*[15] In that case the Supreme Court construed the word "treaty" in the Circuit Courts of Appeals Act of 1891, which authorized a direct appeal to the Court in cases involving "the validity or construction of any treaty," [16] to encompass all international agreements regardless of the manner by which these agreements were brought into force. The Court relied upon the intent of Congress in establishing the provision: Congress deemed questions involving the interpretation of "treaties" to be of sufficient importance to justify direct review to the Court,[17] and the Court perceived no need to distinguish between treaties in the article II sense and other international agreements on that basis. All international compacts entailed binding rights and obligations, the construction of which could have significant bearing on this nation's relations with other nations.[18]

Thus although the term "treaty" under United States law normally connotes an agreement requiring the ratification of the Senate under article II of the Constitution, *Altman* indicates that it does not invariably carry such a meaning.[19] The meaning to be attributed to the word "treaty" ultimately depends upon the intent of Congress in enacting the particular provision in which the term appears. We move, then, to an

---

**13.** Restatement of the Foreign Relations Law of the United States § 302 (Tent. Draft 1 Apr. 1980); *id.*, Introductory note 3, at 74.

**14.** The Restatement defines the scope of a "Congressional-executive agreement" as follows: "The President may make an international agreement with the authorization or approval of Congress dealing with any matter that falls within the powers of Congress and of the President under the Constitution." *Id.* § 307.

**15.** 224 U.S. 583, 32 S.Ct. 593, 56 L.Ed. 894 (1912).

**16.** Act of 3 Mar. 1891, ch. 517, § 5, 26 Stat. 826, 828 (originally codified at 28 U.S.C. § 345 (1926)).

**17.** *See B. Altman & Co. v. United States,* 224 U.S. at 600, 32 S.Ct. at 596.

**18.** *See id.* at 600–01, 32 S.Ct. at 596. The Court stated:
We think that the purpose of Congress was manifestly to permit rights and obligations of that character to be passed upon in the Federal court of final resort, and that matters of such vital importance, arising out of opposing constructions of international compacts, sometimes involving the peace of nations, should be subject to direct and prompt review by the highest court of the Nation. *Id.* at 601, 32 S.Ct. at 597.

**19.** We note, however, that the other case that the district court relied upon for this proposition, *Williams v. Rogers,* 449 F.2d 513 (8th Cir. 1971), *cert. denied,* 405 U.S. 926, 92 S.Ct. 976, 30 L.Ed.2d 799 (1972), is inapposite. That case involved the question whether the Military Bases Agreement of 1947, United States–Philippines, 61 Stat. 4019, T.I.A.S. No. 1775, an executive agreement formulated pursuant to congressional authorization, provided a sufficient basis for the exercise of extradition powers by the executive branch. The Supreme Court in *Valentine v. United States,* 299 U.S. 5, 9, 57 S.Ct. 100, 102, 81 L.Ed. 5 (1936), previously held that the executive possesses no power to extradite fugitive criminals except such as is conferred by treaty or by act of Congress. The Eighth Circuit construed *Valentine* to mean that there need only be "a showing of some authority, whether in the form of congressional dictate or policy, or the provisions of an existing treaty, to provide a legitimate basis for the surrender of fugitives" by the United States to another nation. *Williams v. Rogers,* 449 F.2d at 521. The court found that the executive agreement in question, resting on a valid delegation of legislative authority, constituted a sufficient basis for the exercise of extradition powers by the executive branch. The court thus did not address the question whether the agreement was a "treaty."

examination of the purpose underlying section 106.

### B. *Legislative History*

The legislative history of section 106 is not extensive, but the purpose of the section clearly is set forth in both the Senate and Conference Committee Reports. The Conference Report, for instance, provides:

> The Senate version [of the bill] contained a provision prohibiting job discrimination against American citizens and their dependents in hiring on United States military bases in any foreign country.

> .   .   .   .   .

> The purpose of the Senate provision is to correct a situation which exists at some foreign bases, primarily in Europe, where discrimination in favor of local nationals and against American dependents in employment has contributed to conditions of hardship for families of American enlisted men whose dependents are effectively prevented from obtaining employment.[20]

Concerned with the economic plight of American enlisted personnel and their dependents, Congress thus sought to eliminate the discrimination barrier preventing United States dependents from obtaining civilian positions on overseas military bases, unless such barrier expressly were authorized by "treaty."[21]

After examining the legislative history and finding no explicit definition of the term "treaty," the district court was persuaded that Congress intended to eliminate discriminatory practices against American citizens arising only from ad hoc decision-making of individual commanders to give preference to local nationals and not from any international obligation on the part of the United States to hire local nationals; thus the district court interpreted the treaty exception to encompass all international agreements.

The court primarily based its conclusion upon the extended comments of Senator Schweiker, a sponsor of the amendment, concerning the policy of the commanding general of the Army Exchange System in Europe. The commanding officer in question issued a memorandum directing exchange system employees to hire local nationals rather than United States dependents or tourists because of the allegedly higher wage costs and higher turnover rates for United States citizens.[22] Decrying the general's action, Senator Schweiker stated at one point during the debates:

> I have never heard of anything so ridiculous in my life. We actually send our GI's to Europe at poverty wages. We do not pay to send the wives there. They [the GI's] get over there, and if they do bring their wives at their own expense, the wives cannot even go to the Army

**20.** H.R.Rep. No. 433, 92d Cong., 1st Sess. 31 (1971) (Conference Report). *See* S.Rep. No. 93, 92d Cong., 1st Sess. 23 (1971).

**21.** The exact language of the statute provides "[u]nless prohibited by treaty . . . ," *see* text accompanying note 7 *supra*. The district court considered this language "confusing" and also "significant . . . in evaluating [appellants'] contention that Congress chose its words carefully and meant just what it said when it used the word 'treaty'." *Rossi v. Brown*, 467 F.Supp. 960, 965 (D.D.C.1979). Replacing the phrase "[u]nless prohibited by" with either the words "unless permitted by" or "unless provided by" would convey more precisely the meaning of the statute, but we do not think that this awkward phrasing bears on congressional intent in selecting the word "treaty." That word is a term of art, the meaning of which Congress obviously was well aware.

What Congress really was saying by the words "[u]nless prohibited by treaty," as our review of the background of the legislation makes clear, was "unless the Senate is consulted in regard to any permitted discrimination."

**22.** The memorandum provides in relevant part:

> For the reasons outlined above, I desire that all European Exchange System elements in the months ahead emphasize the recruitment of local nationals and sharply de–emphasize the utilization of US dependents and tourists. Due to the high turnover in the latter category, I feel this transition can be made without actually separating any US personnel.

Memorandum from Brigadier General Charles Phipps (Jan. 1971), *reprinted in* 117 Cong.Rec. 14,389, 14,395 (11 May 1971).

Exchange Service and get a job, because a general has sent out a memorandum that says we are going to give those jobs to the nationals of the countries involved. How ridiculous can one policy be?[23] The court considered these and other similar comments on the commanding general's memorandum[24] to constitute the only significant discussion of section 106. The district court thus concluded that while the legislative history was not unambiguous, it credibly could be argued that "Congress had in mind only those instances of discrimination which resulted from the caprice of individual officers."[25]

We think that this is a constrained and erroneous view of congressional intent. First we note that the memorandum from the commanding general of the Army Exchange System was the only example referred to in the record of an officer issuing a mandate to discriminate against United States citizens in employment. And the debates later indicate that the Army had taken steps to ensure that this particular memorandum was rescinded.[26] While Congress undoubtedly may have wished to prevent situations of this kind from arising in the future, that the particular problem referred to by Senator Schweiker was already being resolved, at least suggests that Congress by enacting section 106 had more in mind than just "the caprice of individual officers." Further scrutiny of the legislative record confirms this supposition.

At the time section 106 was being considered, twelve international agreements were in effect providing for preferential hiring of local nationals on United States military bases. None of these agreements had been submitted to the Senate for ratification.[27] In discussing the economic hardships facing American servicemen and their families, Senator Hughes, the other sponsor of the amendment, specifically referred to these agreements: "[T]hey [dependents of enlisted personnel] are denied the opportunity to work on overseas bases, *by agreement with the countries in which they are located,* and are forced to live in poverty."[28]

**23.** 117 Cong.Rec. 14,389, 14,395 (1971) (remarks of Sen. Schweiker).

**24.** *See, e. g., id.* at 14,397; *id.* at 16,120, 16,128 (remarks of Sen. Schweiker).

**25.** *Rossi v. Brown,* 467 F.Supp. 960, 967 n. 4 (D.D.C.1979).

**26.** This brings me to one more point. Since uncovering the memorandum I brought out a few days ago and read again today, whereby the commanding general of the European exchange system, General Phipps, had recommended that only local nationals be considered for these jobs, the Assistant Secretary of the Army, Roger Kelley, has personally taken over the investigation of this matter. He has assured me that they are going to rectify that particular memorandum, that that memorandum will from now on correspond to the alleged policy that has been operating over there for some time, of giving American nationals some preference.
117 Cong.Rec. 16,120, 16,133 (1971) (remarks of Sen. Schweiker). Since 1961, as a later passage indicates, the official policy of the Department of Defense was to hire United States dependents to the maximum extent possible for civilian positions on overseas military bases. *See id.* The directive from the commanding general of the European Exchange System thus ran expressly contrary to official policy.

**27.** *See, e. g., Rossi v. Brown,* 467 F.Supp. 960, 967 68 (D.D.C.1979); Brief for Appellees at 19 20 & n. 20. Since 1971 the United States has entered into two additional agreements with other countries which provide for preferential hiring of local nationals. Neither of these agreements has been ratified by the Senate. *See, e. g., Rossi v. Brown,* 467 F.Supp. 960, 968 (D.D.C.1979).

**28.** 117 Cong.Rec. 16,120, 16,126 (1971) (remarks of Sen. Hughes) (emphasis added). The Government argues that Senator Hughes' statement probably refers to informal agreements by local base commanders with the host countries to give local nationals preference in hiring. *See* Brief for Appellees at 18 n. 17. The record reflects, however, only one instance of a commanding officer directing the employment of local nationals in lieu of United States citizens, and this policy was formulated unilaterally by the officer, *see* note 23 *supra* and accompanying text—not by any "agreement" with the host country. Thus we think the word "agreement" plausibly could only be a reference to the international agreements providing for discrimination against United States citizens.

We note also that the preferential hiring policy of local nationals was only one obstacle preventing United States dependents from obtaining civilian positions on overseas military bases. In his remarks, Senator Hughes also

Although the evidence is not extensive we take this statement on the part of a cosponsor of the amendment to be an unmistakable indication that Congress intended to abrogate those portions of the existing executive agreements providing for preferential hiring of local nationals.[29]

■ Thus we think that Congress sought to eliminate discrimination against American citizens owing not just to the ad hoc decisionmaking of particular commanders, but also owing to executive agreements between the United States and other countries providing for preferential hiring of local nationals. And *consistent with this purpose, Congress could only have intended the "treaty" exception to include an agreement made by the President with the advice and consent of two–thirds of the Senate.*[30]

The district court felt constrained to apply a broad construction to the word "treaty" in section 106 in part because the interpretation urged by appellants presumably would invalidate the preferential hiring provisions of fourteen international agreements entered into by the President without the advice and consent of the Senate.[31] Because these agreements were entered into "with the understanding that the hiring of local nationals when possible would be part of the *quid pro quo* for the retention by the United States of military bases in the host country,"[32] the court was concerned that abrogation of the preferential hiring provisions would have uncertain repercussions in the conduct of foreign affairs. While we understand the district court's concern, after examining the legislative history we are convinced that Congress was aware of the existence of international agreements providing for preferential hiring of local nationals, and that this was exactly what Congress intended to nullify. We must not overlook the fact that Congress had not been consulted on the agreements.

We might also add that legislation enacted contemporaneously with section 106 supports our conclusion that Congress intended a clear distinction between treaties requiring the ratification of the Senate and other forms of international agreements. In particular, the Case Act makes such a distinction, providing that the executive branch "shall transmit to the Congress the text of any international agreement, other than a treaty, to which the United States is a party as soon as practicable after such

expressed concern that the wives of enlisted men were unable to secure work permits in foreign countries. *See* 117 Cong.Rec. 16,120, 16,126 (1971) (remarks of Sen. Hughes) ("[t]hose in the lowest ranks cannot have their wives obtain anything but a tourist visa").

**29.** Senator Schweiker also quoted from a study prepared by two Army officers, which referred to the classification of civilian jobs for local nationals as one factor contributing to the economic hardship of United States enlisted men:

> Most civilian jobs on U.S. installations in Europe are held by local nationals or by persons from another European country. These jobs are classified as local national jobs and American dependents cannot fill the jobs because of this classification.

117 Cong.Rec. 16,120, 16,132 (1971).

Senator Schweiker commented: "I bet we are the only country in the world that has that unique method of discriminating against [our] enlisted personnel stationed abroad." *Id.*

**30.** This view coincides with the interpretations of the General Accounting Office (GAO), *see* Letter from H. L. Krieger, Director of GAO, to Tony Rossi (21 Aug. 1978) (incorporating Letter from H. L. Krieger, Director of GAO, to Secretary of Defense (27 July 1976)), *reprinted in* J. A. at 203, and, until 1977, of the Department of State, *see, e. g.,* Letter from James H. Michel, Deputy Legal Adviser, Department of State, to Earl J. Silbert, United States Attorney (21 Dec. 1978), *reprinted in* J. A. at 212.

Although Congress in 1944 authorized the President to negotiate and conclude agreements "by such means as he finds appropriate," *see* note 8 *supra*, we think that in 1971 Congress withdrew one method as inappropriate—agreements to employ local nationals in preference to United States citizens for civilian positions on overseas military bases—unless such agreements were ratified by two–thirds of the Senate.

**31.** *See* note 27 *supra*.

**32.** *Rossi v. Brown*, 467 F.Supp. 960, 968 (D.D.C.1979).

agreement has entered into force with respect to the United States." [33]

The district court declined to read section 106 *in pari materia* with the Case Act on the ground that the statutes did not deal with the same subject matter.[34] Although the general subject matter treated in the two enactments is not the same, Congress used precisely the same word in both, suggesting at least that if Congress had intended a more expansive scope for the exception to the ban on discrimination in section 106, it easily could have chosen the term "international agreement" rather than the word "treaty." Moreover we think a similar concern may have been present in both statutes. As a check on the President's power, Congress, in the Case Act, sought to ensure that the legislative branch received timely notice of all international agreements.[35] By enacting section 106, we think that Congress also wanted to exercise some control over whether United States citizens would be discriminated against in the employment of civilian personnel on overseas military bases. We recognize that the usage in contemporaneous legislation is not dispositive in this case; still, we think it weighs in favor of the view that Congress also intended the term "treaty" in section 106 to mean an agreement made by the President with the advice and consent of two–thirds of the Senate.

## III. CONCLUSION

In conclusion, we are persuaded that the word "treaty" in section 106 was used in the sense set forth in article II of the Constitution—an international agreement concluded by the President with the advice and consent of two–thirds of the Senate. This construction is consistent with the terminology normally used under United States law. It also comports with congressional intent to alleviate the economic plight of United States military personnel and their dependents; if we were otherwise to construe the term to encompass all international agreements, the exception to the ban on discrimination virtually would engulf the general rule.

Thus we find that the Base Labor Agreement of 27 May 1968 is not a "treaty" for purposes of section 106, and the provision for preferential hiring set forth in article I of the agreement accordingly is invalidated.[36] We therefore reverse and remand to the district court for further proceedings not inconsistent with this opinion.

*So ordered.*

---

**33.** Act of 22 Aug. 1972, Pub.L.No. 92–403, § 112b, 86 Stat. 619 (codified at 1 U.S.C. § 112b (1976)). The Department of State relied upon the Case Act in its opinion issued in 1975 that the Base Labor Agreement was *not a treaty* for purposes of section 106. *See* Letter from John A. Boyd, Acting Assistant Legal Adviser for Treaty Affairs, to James E. Masterson, Assistant General Counsel, GAO, at 4 (8 Aug. 1975), *reprinted in* J. A. at 220, 223. Senate Resolution 214 also provides that agreements with Portugal or Bahrain for military bases should be negotiated through treaties submitted to the Senate for ratification rather than through executive agreements. *See* S.Rep. No. 632, 92d Cong., 2d Sess. 1 (1972).

**34.** *See Rossi v. Brown,* 467 F.Supp. 960, 967 (D.D.C. 1979).

**35.** An attempt to exert some check on the President's power also prompted the passage of Senate Resolution 214, which required that agreements with Portugal or Bahrain for military bases be negotiated through treaties submitted to the Senate, *see* note 33 *supra.* The Senate Report provides, for example: "Senate Resolution 214 makes it clear that the character of the agreements [for military bases or foreign assistance to Portugal or Bahrain] and their broad policy implications are too important to be left to unilateral action by the executive branch." S. Rep. No. 632, 92d Cong., 2d Sess. 1 (1972).

**36.** Because of this conclusion, we need not address the question of whether the provision for preferential hiring of Filipinos in the Base Labor Agreement violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1976).