WEINBERGER, SECRETARY OF DEFENSE, ET AL. *v.* ROSSI ET AL.

No. 80–1924.   Argued February 22, 1982—Decided March 31, 1982

REHNQUIST, J., delivered the opinion for a unanimous court.

*Barbara E. Etkind* argued the cause for petitioners. With her on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller, William G. Kanter,* and *Freddi Lipstein.*

*Randy M. Mott* argued the cause for respondents. With him on the brief were *Raymond J. Rasenberger, Charles J. Simpson, Jr., J. Stanley Pottinger, Warren L. Dennis,* and *Carolyn Dye.**

JUSTICE REHNQUIST delivered the opinion of the Court.

Section 106 of Pub. L. 92–129, 85 Stat. 355, note following 5 U. S. C. § 7201 (1976 ed., Supp. IV), prohibits employment discrimination against United States citizens on military bases overseas unless permitted by "treaty." The question in this case is whether "treaty" includes executive agreements concluded by the President with the host country, or whether the term is limited to those international agreements entered into by the President with the advice and consent of the Senate pursuant to Art. II, § 2, cl. 2, of the United States Constitution. This issue is solely one of statutory interpretation.

I

In 1944, Congress authorized the President, "by such means as he finds appropriate," to acquire, after negotiation with the President of the Philippines, military bases "he may deem necessary for the mutual protection of the Philippine Islands and of the United States." 58 Stat. 626, 22 U. S. C. § 1392. Pursuant to this statute, the United States and the

---

*Briefs of *amici curiae* urging affirmance were filed by *Mark D. Roth* for the American Federation of Government Employees, AFL–CIO, et al.; and by *Cornelius B. Kennedy* for Congressman William V. Chappel, Jr., et al.

Republic of the Philippines in 1947 entered into a 99-year Military Bases Agreement (MBA), Mar. 14, 1947, 61 Stat. 4019, T. I. A. S. No. 1775.[1] The MBA grants the United States the use of various military facilities in the Philippines. It does not, however, contain any provisions regarding the employment of local nationals on the base. In 1968, the two nations negotiated a Base Labor Agreement (BLA), May 27, 1968, [1968] 19 U. S. T. 5892, T. I. A. S. No. 6542, as a supplement to the MBA. The BLA, *inter alia*, provides for the preferential employment of Filipino citizens at United States military facilities in the Philippines.[2]

In 1971, Congress enacted § 106 of Pub. L. 92–129, the employment discrimination statute at issue in this case.[3] At the time § 106 was enacted, 12 agreements in addition to the BLA were in effect providing for preferential hiring of local nationals on United States military bases overseas. Since § 106 was enacted, four more such agreements have been concluded.[4] None of these agreements were submitted to the Senate for its advice and consent pursuant to Art. II, § 2, cl. 2, of the Constitution.

---

[1] This agreement has been amended periodically, most recently on January 7, 1979. [1978–1979] 30 U. S. T. 863, T. I. A. S. No. 9224.

[2] In relevant part, Article I of the BLA provides:

"1. *Preferential Employment.*—The United States Armed Forces in the Philippines shall fill the needs for civilian employment by employing Filipino citizens, except when the needed skills are found, in consultation with the Philippine Department of Labor, not to be locally available, or when otherwise necessary for reasons of security or special management needs, in which cases United States nationals may be employed. . . ."

[3] Section 106 provides in pertinent part:

"*Unless prohibited by treaty*, no person shall be discriminated against by the Department of Defense or by any officer or employee thereof, in the employment of civilian personnel at any facility or installation operated by the Department of Defense in any foreign country because such person is a citizen of the United States or is a dependent of a member of the Armed Forces of the United States." 85 Stat. 355, note following 5 U. S. C. § 7201 (1976 ed., Supp. IV) (emphasis added).

[4] Brief for Petitioners 5–6, and nn. 3–4.

In 1978, respondents, all United States citizens residing in the Philippines, were notified that their jobs at the United States Naval Facility at Subic Bay were being converted into local national positions in accordance with the BLA, and that they would be discharged from their employment with the Navy. After unsuccessfully pursuing an administrative remedy, respondents filed suit in the United States District Court for the District of Columbia, alleging that the preferential employment provisions of the BLA violated, *inter alia*, § 106. The District Court granted summary judgment for petitioners, *Rossi* v. *Brown*, 467 F. Supp. 960 (1979), but the Court of Appeals reversed. *Rossi* v. *Brown*, 206 U. S. App. D. C. 148, 642 F. 2d 553 (1980). We in turn reverse the Court of Appeals.

## II

Simply because the question presented is entirely one of statutory construction does not mean that the question necessarily admits of an easy answer. Chief Justice Marshall long ago observed that "[w]here the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived . . . ." *United States* v. *Fisher*, 2 Cranch 358, 386 (1805). More recently, the Court has stated:

> "Generalities about statutory construction help us little. They are not rules of law but merely axioms of experience. They do not solve the special difficulties in construing a particular statute. The variables render every problem of statutory construction unique." *United States* v. *Universal Corp.*, 344 U. S. 218, 221 (1952) (citations omitted).

We naturally begin with the language of § 106, which provides in relevant part as follows:

> "*Unless prohibited by treaty*, no person shall be discriminated against by the Department of Defense or by any officer or employee thereof, in the employment of civilian personnel at any facility or installation operated by the Department of Defense in any foreign country be-

cause such person is a citizen of the United States or is a dependent of a member of the Armed Forces of the United States." 85 Stat. 355, note following 5 U. S. C. § 7201 (1976 ed., Supp. IV) (emphasis added).

The statute is awkwardly worded in the form of a double negative, and we agree with the Court of Appeals that "[r]eplacing the phrase '[u]nless prohibited by' with either the words 'unless permitted by' or 'unless provided by' would convey more precisely the meaning of the statute, but we do not think that this awkward phrasing bears on congressional intent in selecting the word 'treaty.'" 206 U. S. App. D. C., at 153, n. 21, 642 F. 2d, at 558, n. 21. Discrimination in employment against United States citizens at military facilities overseas is prohibited by § 106, unless such discrimination is permitted by a "treaty" between the United States and the host country. Our task is to determine the meaning of the word "treaty" as Congress used it in this statute. Congress did not separately define the word, as it has done in other enactments. *Infra*, at 30. We must therefore ascertain as best we can whether Congress intended the word "treaty" to refer solely to Art. II, § 2, cl. 2, "Treaties"—those international agreements concluded by the President with the advice and consent of the Senate—or whether Congress intended "treaty" to also include executive agreements such as the BLA.

The word "treaty" has more than one meaning. Under principles of international law, the word ordinarily refers to an international agreement concluded between sovereigns, regardless of the manner in which the agreement is brought into force. 206 U. S. App. D. C., at 151, 642 F. 2d, at 556.[5] Under the United States Constitution, of course, the word "treaty" has a far more restrictive meaning. Article II, § 2,

---

[5] See Vienna Convention on the Law of Treaties, May 23, 1969, Art. 2, ¶ 1(a), reprinted in 63 Am. J. Int'l L. 875, 876 (1969); Restatement of Foreign Relations of the United States, Introductory Note 3, p. 74 (Tent. Draft No. 1, Apr. 1, 1980) ("[I]nternational law does not distinguish between agreements designated as 'treaties' and other agreements").

cl. 2, of that instrument provides that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."[6]

Congress has not been consistent in distinguishing between Art. II treaties and other forms of international agreements. For example, in the Case Act, 1 U. S. C. § 112b(a) (1976 ed., Supp. IV), Congress required the Secretary of State to "transmit to the Congress the text of any international agreement, . . . other than a treaty, to which the United States is a party" no later than 60 days after "such agreement has entered into force."[7] Similarly, Congress has explicitly referred to Art. II treaties in the Fishery Conservation and Management Act of 1976, 16 U. S. C. § 1801 *et seq.* (1976 ed. and Supp. IV),[8] and the Arms Control and Disarmament Act, 22 U. S. C. § 2551 *et seq.* (1976 ed. and Supp. IV).[9] On the other hand, Congress has used "treaty" to re-

---

[6] We have recognized, however, that the President may enter into certain binding agreements with foreign nations without complying with the formalities required by the Treaty Clause of the Constitution, even when the agreement compromises commercial claims between United States citizens and a foreign power. See, *e. g., Dames & Moore* v. *Regan,* 453 U. S. 654 (1981); *United States* v. *Pink,* 315 U. S. 203 (1942); *United States* v. *Belmont,* 301 U. S. 324 (1937). Even though such agreements are not treaties under the Treaty Clause of the Constitution, they may in appropriate circumstances have an effect similar to treaties in some areas of domestic law.

[7] In this context, it is entirely logical that Congress should distinguish between Art. II treaties and other international agreements. Submission of Art. II treaties to the Senate for ratification is already required by the Constitution.

[8] Congress defined "treaty" to mean "any international fishery agreement which is a treaty within the meaning of section 2 of article II of the Constitution." 16 U. S. C. § 1802(23).

[9] "[N]o action shall be taken under this chapter or any other law that will obligate the United States to disarm or to reduce or to limit the Armed Forces or armaments of the United States, except pursuant to the treaty making power of the President under the Constitution or unless authorized by further affirmative legislation by the Congress of the United States." 22 U. S. C. § 2573.

fer only to international agreements other than Art. II treaties. In 39 U. S. C. § 407(a), for example, Congress authorized the Postal Service, with the consent of the President, to "negotiate and conclude postal treaties or conventions." A "treaty" which requires only the consent of the President is not an Art. II treaty. Thus it is not dispositive that Congress in § 106 used the term "treaty" without specifically including international agreements that are not Art. II treaties.

The fact that Congress has imparted no precise meaning to the word "treaty" as that term is used in its various legislative Acts was recognized by this Court in *B. Altman & Co.* v. *United States*, 224 U. S. 583 (1912). There this Court construed "treaty" in § 5 of the Circuit Court of Appeals Act of 1891, ch. 517, 26 Stat. 826, to include international agreements concluded by the President under congressional authorization. 224 U. S., at 601. The Court held that the word "treaty" in the jurisdictional statute extended to such an agreement, saying: "If not technically a treaty requiring ratification, nevertheless it was a compact authorized by the Congress of the United States, negotiated and proclaimed under the authority of its President. We think such a compact is a treaty under the Circuit Court of Appeals Act . . . ." *Ibid.*

The statute involved in the *Altman* case in no way affected the foreign policy of the United States, since it dealt only with the jurisdiction of this Court. In the case of a statute such as § 106, that does touch upon the United States' foreign policy, there is even more reason to construe Congress' use of "treaty" to include international agreements as well as Art. II treaties. At the time § 106 was enacted, 13 executive agreements provided for preferential hiring of local nationals. *Supra*, at 27. Thus, if Congress intended to limit the "treaty exception" in § 106 to Art. II treaties, it must have intended to repudiate these executive agreements that affect the hiring practices of the United States only at its military bases overseas. One would expect that Congress would be aware

that executive agreements may represent a *quid pro quo:* the host country grants the United States base rights in exchange, *inter alia,* for preferential hiring of local nationals. See n. 17, *infra.*

It has been a maxim of statutory construction since the decision in *Murray* v. *The Charming Betsy,* 2 Cranch 64, 118 (1804), that "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains . . . ." In *McCulloch* v. *Sociedad Nacional de Marineros de Honduras,* 372 U. S. 10, 20–21 (1963), this principle was applied to avoid construing the National Labor Relations Act in a manner contrary to State Department regulations, for such a construction would have had foreign policy implications. The *McCulloch* Court also relied on the fact that the proposed construction would have been contrary to a "well-established rule of international law." *Id.,* at 21. While these considerations apply with less force to a statute which by its terms is designed to affect conditions on United States enclaves outside of the territorial limits of this country than they do to the construction of statutes couched in general language which are sought to be applied in an extraterritorial way, they are nonetheless not without force in either case.

At the time § 106 was enacted, there were in force 12 agreements in addition to the BLA providing for preferential hiring of local nationals on United States military bases overseas. Since the time of the enactment of § 106, four more such agreements have been concluded, and none of these were submitted to the Senate for its advice and consent. *Supra,* at 27. We think that some affirmative expression of congressional intent to abrogate the United States' international obligations is required in order to construe the word "treaty" in § 106 as meaning only Art. II treaties. We therefore turn to what legislative history is available in order to ascertain whether such an intent may fairly be attributed to Congress.

The legislative history seems to us to indicate that Congress was principally concerned with the financial hardship to

American servicemen which resulted from discrimination against American citizens at overseas bases. As the Conference Committee Report explains:

> "The purpose of [§ 106] is to correct a situation which exists at some foreign bases, primarily in Europe, where discrimination in favor of local nationals and against American dependents in employment has contributed to conditions of hardship for families of American enlisted men whose dependents are effectively prevented from obtaining employment." H. R. Conf. Rep. No. 92–433, p. 31 (1971).

The Conference Report, however, is entirely silent as to the scope of the "treaty" exception. Similarly, there is no mention of the 13 agreements that provided for preferential hiring of local nationals. Thus, the Conference Report provides no support whatsoever for the conclusion that Congress intended in some way to limit the President's use of international agreements that may discriminate against American citizens who seek employment at United States military bases overseas.

On the contrary, the brief congressional debates on this provision indicate that Congress was not concerned with limiting the authority of the President to enter into executive agreements with the host country, but with the ad hoc decisionmaking of military commanders overseas. In early 1971, Brig. Gen. Charles H. Phipps, Commanding General of the European Exchange System, issued a memorandum encouraging the recruitment and hiring of local nationals instead of United States citizens at the system's stores. The hiring of local nationals, General Phipps reasoned, would result in lower wage costs and turnover rates.[10] Senator Schweiker, a sponsor of § 106, complained of General Phipps' policy.[11]

---

[10] See 117 Cong. Rec. 14395 (1971) (remarks of Sen. Schweiker).

[11] "I have never heard of anything so ridiculous in my life. We actually send our GI's to Europe at poverty wages. We do not pay to send the wives there. They have to beg or borrow that money. They get over

Both the Conference Report and the debates [12] indicate that Congress was concerned primarily about the economic hardships American servicemen endured in Europe, particularly Germany. In this regard, it must be noted that of the 13 executive agreements in existence at the time § 106 was enacted, only one involved an agreement with a European country—Iceland. [13] The Agreement Between the Parties to the North Atlantic Treaty Organization Regarding the Status of Their Forces, June 19, 1951, [1953] 4 U. S. T. 1792, T. I. A. S. No. 2846, [14] merely provides that local law governs the terms and conditions of the employment of local nationals. It does not provide for preferential treatment for local nationals. Thus, those servicemen whose interests Congress expressly sought to further in § 106 were not subject to the type of agreement at issue in this case.

The Court of Appeals relied heavily on a statement by Senator Hughes, a sponsor of § 106, that dependents of enlisted personnel "are denied the opportunity to work on overseas bases, by agreement with the countries in which they are located, and are forced to live in poverty." 117 Cong. Rec. 16126 (1971). Taken out of context, this remark is certainly supportive of respondents' position. In context, however, it is not altogether clear to which "agreements" Sena-

there, and if they do bring their wives at their own expense, the wives cannot even go to the Army Exchange Service and get a job, because a general has sent out a memorandum that says we are going to give those jobs to the nationals of the countries involved." *Ibid.*

At another point, Senator Schweiker commented: "Here is an American general saying that when the GI's go to their canteen or service post exchange and spend their money, they do not even have the right to have their wives working there because we should give those jobs to German nationals." *Id.,* at 16128.

[12] See, *e. g., id.,* at 14395 (remarks of Sen. Schweiker); *id.,* at 16126 (remarks of Sen. Cook); *ibid.* (remarks of Sen. Hughes).

[13] Agreement Concerning the Status of United States Personnel and Property (Annex), May 8, 1951, United States-Iceland, [1951] 2 U. S. T. 1533, T. I. A. S. No. 2295.

[14] This NATO agreement is an Art. II treaty.

tor Hughes was referring. Immediately prior to this remark, Senator Cook explained that dependents of American servicemen were unable to obtain anything but tourist visas, thus precluding them from working in the local economy:

> "On my inquiry of the Defense Department, it was my understanding that there was an agreement, through the NATO organization, that those young wives, because they were there on tourists visas, could not get a work permit under any circumstances." *Ibid.*

As we indicated above, the NATO agreements do not contain any provision for preferential hiring of local nationals. *Supra,* at 34. Senator Hughes could well have been referring to agreements that in effect precluded dependents from working in the local economy. Be that as it may, it suffices to say that one isolated remark by a single Senator, ambiguous in meaning when examined in context, is insufficient to establish the kind of affirmative congressional expression necessary to evidence an intent to abrogate provisions in 13 international agreements.[15]

Finally, respondents rely on postenactment legislative history that "firmly reiterate[s] the Congressional policy against preferential hiring of local nationals." Brief for Respondents 23. In particular, respondents offer two examples of congressional Committees urging the Department of Defense to renegotiate those agreements containing local-national preferential hiring provisions.[16] Such *post hoc* statements of a congressional Committee are not entitled to much weight. *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 118, and n. 13 (1980). If anything, these postenactment statements cut *against* respondents' argu-

---

[15] The contemporaneous remarks of a sponsor of legislation are certainly not controlling in analyzing legislative history. *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 118 (1980); *Chrysler Corp.* v. *Brown,* 441 U. S. 281, 311 (1979).

[16] See H. R. Rep. No. 95–68, p. 25 (1977); H. R. Conf. Rep. No. 97–410, p. 54 (1981).

ment that Congress sought in § 106 to eliminate discrimination owing to executive agreements. By urging the Department of Defense to renegotiate these agreements, the Committees assume the validity of those very international agreements respondents contend were abrogated by Congress in § 106.[17]

While the question is not free from doubt, we conclude that the "treaty" exception contained in § 106 extends to executive agreements as well as to Art. II treaties. The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.[18]

*It is so ordered.*

---

[17] Although we do not ascribe it much weight, we note that a Conference Committee recently deleted a provision that would have prohibited the hiring of foreign nationals at military bases overseas when qualified United States citizens are available. *Ibid.* In urging this provision's deletion, Senator Percy explained that the provision would place the United States in violation of its obligations, *inter alia,* under the BLA with the Philippines. 127 Cong. Rec. S14110 (Nov. 30, 1981). He argued:

"Some host nations might view enactment of 777 as a material breach of our agreements, thus entitling them to open negotiations on terminating, redefining or further restricting U. S. basing and use rights. Nations could, for example, retaliate by suspending or reducing our current rights to engage in routine military operations such as aircraft transits." *Ibid.*

[18] In view of its construction of § 106, the Court of Appeals found it unnecessary to determine whether the BLA in the instant case violated Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV). *Rossi* v. *Brown,* 206 U. S. App. D. C. 148, 156, n. 36, 642 F. 2d 553, 561, n. 36 (1980). Because this question was neither raised in the petition for certiorari nor reached by the Court of Appeals, we do not consider it.