STATE EX REL. George S. MELENTOWICH,
Petitioner-Appellant,

v.

Raymond J. KLINK, Sheriff, Waukesha County,
Wisconsin, Respondent,

STATE of Wisconsin, Intervenor.

Supreme Court

*No. 81–371. Argued June 3, 1982.—Decided July 2, 1982.*

(Also reported in 321 N.W.2d 272.)

For the petitioner-appellant there were briefs and oral argument by *Margaret A. Maroney,* assistant state public defender.

For the respondent there was a brief and oral argument by *Robert G. Mawdsley,* of Waukesha, assistant district attorney.

For the intervenor the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

WILLIAM G. CALLOW, J. This is an appeal from a judgment and order dated February 19, 1981, of the Waukesha county circuit court Judge Neal P. Nettesheim, denying the petition of George S. Melentowich which sought relief by a writ of habeas corpus. Melentowich challenges the order directing his return to the state of California. The court of appeals certified this case to us on January 21, 1982, and we granted certification on February 8, 1982, because it involves an issue[1] of first impression in this state.

---

[1] The issues certified by the court of appeals are: "(1) Are secs. 51.81–.85, Stats., supplemental (and therefore to be read into) the Interstate Compact on Mental Health? (2) May a state which is not a member of the compact use those statutes to extradite an escaped patient from Wisconsin? (3) If not, what provisions, if any, may be used? (4) What constitutes 'flight' for purposes of the time limitation set forth in sec. 51.84, Stats.?"

The parties agree that secs. 51.81–51.85, Stats., are *independent* pieces of legislation from the Interstate Compact on Mental Health. The uniform act referred to in sec. 51.85 is the Uniform Act for the Extradition of Persons of Unsound Mind.

Unlike the Interstate Compact on Mental Health which limits its applicability to party states, the extradition provisions of secs. 51.81–51.85, Stats., contain no clause limiting the extradition of escaped mental patients to states which have enacted the uniform act. All parties agree that California may apply for extradition under secs. 51.81–51.85 as long as they comply with the statutory procedures. Accordingly, the first three issues certified by the court of appeals will not be addressed within this opinion.

On May 29, 1974, petitioner was found not guilty by reason of insanity by the superior court of the state of California of several crimes committed while he was a walkaway mental patient. The crimes were second-degree murder of a Trinity county deputy sheriff and two counts of assault with a deadly weapon. That court ordered petitioner committed to a California state psychiatric hospital for treatment until such time as his sanity was restored.

On July 27, 1979, Melentowich left the California state hospital without permission, and he testified that he left California on or about July 28, 1979. After going to Reno, Nevada, Chicago, and New York, petitioner came to Wisconsin on or about December 17, 1979, where his mother resides. A week after petitioner absconded, the California superior court issued a bench warrant for his apprehension and return to the California psychiatric hospital.

In April of 1980, the petitioner was arrested in Waukesha county on charges of disorderly conduct. After discovering that petitioner was a walkaway mental patient from the California hospital, Wisconsin authorities contacted California authorities on approximately April 8, 1980, to inquire about his status. California authorities confirmed that petitioner was a walkaway mental patient from California state hospital and was considered "extremely dangerous," particularly when he was not on medication. California state hospital personnel stated that through the years petitioner has walked away from institutions on numerous occasions, but he has always been apprehended within the state of California and returned to the hospital. California hospital personnel stated that, because petitioner absconded to Wisconsin, in order to return him to the hospital "the situation was more complicated" because of extradition red tape.

The Waukesha county district attorney elected to pursue petitioner's civil commitment rather than a criminal prosecution for disorderly conduct. On May 30, 1980, Waukesha county circuit court Judge Willis J. Zick ordered petitioner committed to the custody of the Community Board of Waukesha County/Department of Health and Social Services for involuntary treatment at Mendota Mental Health Institute for a six-month period. In October of 1980, petitioner was transferred to Northview Hospital, and in December of that year he was granted a conditional transfer from Northview to live with his mother in Hartland, Wisconsin, and receive outpatient treatment at Northview Hospital.

On Nevember 28, 1980, approximately seven and one-half months after California was informed of petitioner's presence in Wisconsin, Governor Brown of California executed a demand for petitioner's return to that state pursuant to secs. 51.82 and 51.83, Stats. Governor Dreyfus signed a warrant for petitioner's arrest for extradition on February 2, 1981. Following his arrest, Melentowich petitioned the court for a writ of habeas corpus, contending extradition proceedings were unlawful because he was not subject to criminal extradition (escape from a mental hospital is not a crime in California), and mental patient extradition is barred by the one-year statute of limitations in sec. 51.84.[2]

The question before this court on review is one of statutory interpretation of the word "flight" in sec. 51.81, Stats.[3] The issue is whether petitioner's extra-

[2] Sec. 51.84, Stats., provides:

"51.84 **Limitation of time to commence proceeding.** Any proceedings under this chapter shall be begun within one year after the flight referred to in ss. 51.81 to 51.85."

[3] Sec. 51.81, Stats., provides:

"51.81 **Definitions.** The terms 'flight' and 'fled' as used in ss. 51.81 to 51.85 shall be construed to mean any voluntary or involuntary departure from the jurisdiction of the court where the

dition is barred by the statute of limitations in sec. 51.84, which provides that mental patient extradition proceedings must be begun within one year after the patient's departure from the jurisdiction of the court in which proceedings are pending, or departure from the state where an individual was under detention as a person of "unsound mind." The petitioner contends that his "flight" must be calculated as of July 28, 1979 (the date the California hospital noticed his absence and the date the petitioner testified he departed from the jurisdiction of the court), or August 2, 1979 (the date the Sacramento county superior court issued a bench warrant for his apprehension which indicated he was no longer under its jurisdiction). Thus petitioner argues that the one-year statute of limitations expired, at the latest, on August 2, 1980. Governor Dreyfus's warrant for petitioner's arrest for extradition was signed February 2, 1981—six months after the statute of limitations would have run under the petitioner's reasoning.

The trial court concluded that the word "flight" in sec. 51.81, Stats., meant the date the petitioner was *discovered* in Wisconsin, and consequently, California's demand for extradition and Governor Dreyfus's warrant for petitioner's arrest for extradition were timely be-

proceedings hereinafter mentioned may have been instituted and are still pending with the effect of avoiding, impeding or delaying the action of the court in which such proceedings may have been instituted or be pending, or any such departure from the state where the person demanded then was, if he then was under detention by law as a person of unsound mind and subject to detention. The word 'state' wherever used in ss. 51.81 to 51.85 shall include states, territories, districts and insular and other possessions of the United States. As applied to a request to return any person within the purview of ss. 51.81 to 51.85 to or from the District of Columbia, the words, 'executive authority,' 'governor' and 'chief magistrate,' respectively, shall include a justice of the supreme court of the District of Columbia and other authority."

cause the statute of limitations did not begin to run until April 8, 1980, the date Waukesha authorities contacted California authorities informing them of petitioner's presence in the state. In the alternative, the trial court held that the issuance of the California bench warrant constituted commencement of the extradition proceedings. We agree with the trial court that the word "flight" in sec. 51.81 references a period of time from departure until the date of discovery of an escaped mental patient in a subsequent state. The statute of limitations, therefore, had not run on petitioner's extradition. We do not reach the trial court's alternative construction of "flight" commencing with the issuance of the California bench warrant.

Any analysis of statutory construction must begin with the language of the statute itself. *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 187 (1980); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337 (1979); *State ex rel. E.R. v. Flynn*, 88 Wis. 2d 37, 42, 276 N.W.2d 313 (1979). Sec. 51.84, Stats., creates a one-year statute of limitations for the return of fugitive mental patients and specifically states: "Any proceedings under this chapter shall be begun within one year after the flight." The term "flight" is defined in sec. 51.81, Wisconsin's extradition statute which is this state's enactment of the Uniform Act for the Return of Persons of Unsound Mind. "Flight" is construed to mean either (1) a voluntary or involuntary departure from the jurisdiction of the court during an ongoing proceeding, or (2) any departure from the state where a person demanded was under legal detention as being of "unsound mind." Both parties agree that petitioner fits within the second definition, or category, of flight.[4]

---

[4] Defense counsel argued petitioner also falls within the first category of flight as petitioner's California commitment consti-

Petitioner urges us to adopt a plain meaning interpretation of the statute of limitations in secs. 51.84 and 51.81, Stats.: Any extradition proceeding is to commence within one year of the absconder's *departure* from the committing state. Respondent argues that the only reasonable construction of the statute is to construe flight as the date of discovery by the committing state of the patient's presence in another state. In other words, flight refers to a span of time and distance over which the fugitive travels after leaving the mental institution until flight is ended by discovery.

At the outset of our analysis we are reminded: "Simply because the question presented is entirely one of statutory construction does not mean that the question necessarily admits of an easy answer." *Weinberger v. Rossi,* —— U.S. ——, 102 S. Ct. 1510, 1513 (1982). We note that sec. 51.81, Stats., was originally created in 1919, and drafting records do not exist for the bill. Consequently, there is no legislative history available to guide us in our interpretation of this statute.

In construing any statute, our principal aim is to achieve a reasonable construction which will effectuate the statute's purpose. *See Jankowski v. Milwaukee County,* 104 Wis. 2d 431, 436–37, 312 N.W.2d 45 (1981); *Schwartz v. ILHR Dept.,* 72 Wis. 2d 217, 222, 240 N.W. 2d 173 (1976); *Pfingsten v. Pfingsten,* 164 Wis. 308, 313, 159 N.W. 921 (1916). *See also Holy Trinity Church v. United States,* 143 U.S. 457, 459–60 (1892). We note that the overriding purpose of Chapter 51, Stats., is

---

tuted close court supervision which is an ongoing proceeding. The assistant district attorney argued the first definition of flight was inapplicable because once an order of commitment is entered there is no ongoing proceeding. Because we agree with the parties that petitioner clearly falls within the second definition of flight, we need not examine these arguments.

the treatment of persons suffering from mental illness. The purpose of secs. 51.81–51.85 is clearly the return of those in need of treatment to the place of original commitment where they were receiving such treatment. Thus we will construe these sections with this purpose in mind.

The departure referred to in sec. 51.81, Stats., can only be established with certainty when the committee is discovered in an asylum state. Sections 51.81–51.85 clearly recognize the legitimate interest of the committing state as being superior to that of the asylum state. Harmonizing the statutory interest in the treatment of the mentally ill and the statutory right of the committing state to claim the committee to implement its determination that treatment is needed clearly dictates the conclusion we reach.

Respondent convincingly argues that to construe the statute of limitations in sec. 51.84, Stats., as running from the date of an absconder's departure from the committing state would deny some fugitives the treatment they need. If an escaped patient were successful in eluding capture for a year, under such a construction, that person would no longer be subject to the treatment needed. This may encourage a patient who has resisted commitment and needs treatment to abscond and hide for a year. Departure time may be difficult to measure if a patient leaves but returns to the committing state only to subsequently depart again. A very real difficulty, as we perceive this issue, is that, if flight is measured as of the date of departure from the demanding state, a court is frequently forced to rely solely upon the escaped committee's testimony which may be designed to comport with a running of the statute of limitations or be unreliable because of the committee's lack of mental competence. For example, in the instant case the only evidence of the date of petitioner's departure from California is the petitioner's testimony.

Respondent argues that defining flight as a period of time ending in discovery yields a very reasonable result which promotes the purpose of Chapter 51, Stats. The one-year limit forces the demanding state, upon discovery of the absconder in the asylum state, to review the ongoing inquiry and make a determination whether the absconder's mental condition merits its determination that he is no longer in need of treatment and may be released from commitment. If the demanding state makes no demand within one year of the absconder's discovery, either because it determines the absconder is no longer a societal threat or because the asylum state has sufficient control over the absconder or it takes no action, then the absconder is protected from extradition by the statute of limitations. This accomplishes the overriding purpose of Chapter 51: Treatment of persons adjudicated to be mentally ill.

Both petitioner and respondent cite to numerous dictionary definitions of the word "flight." However, we do not find these definitions instructive in this case. There is also a dearth of case precedent in other jurisdictions dealing with this issue. Petitioner cites heavy reliance upon *In re Chaffee*, 211 Tenn. 88, 362 S.W.2d 467 (1962), for the proposition that a one-year statute of limitations in a uniform law is to be construed strictly in favor of the mental patient. *See also Forgan v. Smedal*, 203 Wis. 564, 570, 234 N.W. 896 (1931) (courts should construe uniform acts to the end that uniformity may result). We find that *In re Chaffee*, which did not deal with an escape, is distinguishable from the controversy before us (the mental patient in *Chaffee* had been released from a state institution, had established residency in a different state, and then petitioned the first state for a determination of sanity).

In interpreting statutes of limitations, petitioner analogizes the statute of limitations in sec. 51.84, Stats., to

the statutes of limitations in the areas of tort and malpractice law to support his contention that the date of departure tolls the statute. We conclude, however, that different policy considerations are present in the case of extradition of mental patients and, therefore, such analogy is not warranted.

Petitioner makes the interesting argument that the practical problems with defining the date of flight as the date of departure are no greater than defining flight as the date of discovery. We find this argument unpersuasive because in the first instance the date of departure is usually known only to the committee. The date of discovery and the subsequent communication to the demanding state are usually a matter of public record.

While the legislature could have spoken with greater clarity, sound principles of statutory construction resolve our inquiry. While flight begins on the date of a patient's departure from the committing state, it continues until the patient is discovered in the asylum state at which point flight ends, and the one-year statute of limitations is computed from that date. *Accord Commonwealth v. Fusci,* 153 Pa. Super. 617, 621, 35 A.2d 93, 95 (1943) ("Flight consists not only in the act of leaving the jurisdiction; it also comprehends continued concealment to avoid arrest and prosecution") ; *Commonwealth v. Myers,* 131 Pa. Super. 258, 264–65, 200 A. 143, 146 (1938) (flight includes " 'the evading of the course of justice by voluntarily withdrawing oneself in order to avoid arrest or detention' "). We conclude that the only reasonable interpretation of the word flight is that it refers to the date the committing state discovers the presence of the absconder in the asylum state. Any other interpretation would encourage mental patients to abscond and hide for a year in order to gain their freedom from necessary confinement and needed treatment. Such

a result would be clearly contrary to Chapter 51, Stats., which recognizes society's interest in detaining mentally ill people in order to protect the public and afford such people appropriate treatment to restore their mental health.

*By the Court.*—The judgment and order of the circuit court are affirmed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. I dissent because I conclude that the majority has adopted a tortured interpretation of the statute. The majority should interpret the statute according to the ordinary usage of language and to accomplish the legislative purpose.

This case involves the Uniform Act for the Extradition of Persons of Unsound Mind, secs. 51.81–51.85, Stats. 1979–80. The Uniform Act is very short, consisting of only five sections: a definitional section; the substantive provision setting forth the circumstances under which extradition is authorized; the procedure for extradition; a statute of limitations; and a direction that the statute be construed to make it uniform with the law of other states.

The statute of limitations of the Uniform Act is in issue here. Sec. 51.84 requires that proceedings under the Uniform Act "shall be begun within one year after the *flight.*" The Uniform Act defines the word flight as follows:

"51.81 **Definitions.** The terms 'flight' and 'fled' as used in ss. 51.81 to 51.85 shall be construed to mean any voluntary or involuntary departure from the jurisdiction of the court where the proceedings hereinafter mentioned may have been instituted and are still pending with the effect of avoiding, impeding or delaying the action of the court in which such proceedings may have been instituted or be pending, or any such departure from the state where the person demanded then was, if he then was under detention by law as a person of unsound mind and subject to detention."

The legislature defines "flight" and "fled" as a departure, making no reference to the time of discovery of the departure, or to the time of discovery that the person left the state or to the notion that "flight" is not a moment in time but a continuum. The majority nevertheless concludes that flight "references a period of time from departure until the date of discovery of an escaped mental patient in a subsequent state" (*supra,* p. 379) and that the definition of "flight" in sec. 51.85 "refers to a span of time and distance over which the fugitive travels." (*Supra,* p. 380) This is colorful and picturesque language, but it does not comport with the statute. I predicate this conclusion on several factors.

First, the legislature's definition of flight is in terms of departure. A departure is the act of going away, the setting out. The word "flight" as defined in sec. 51.81 therefore seems to refer to a single moment, not a span of time and distance. Departure from the state need not mean leaving the geographical boundaries of the state as the majority concludes. Departure from the state can mean eluding the authority of the state by being unavailable to the processes of the state.

Second, the statute makes no sense if the majority's definition is inserted wherever the word flight appears; the court would have to use several meanings of the word flight if the statute is to make sense. For example, in sec. 51.82 the only definition of flight that can be applied readily and consistently is that of a single moment, not a span of time and distance.

Third, the legislative history of the Act supports the interpretation I urge. The purpose of the law is to aid the mentally ill, and therefore the statute must be interpreted for the benefit of the mentally ill person, not for the benefit of the state of California or Wisconsin.

Because secs. 51.81–51.85 were enacted before 1927, no Wisconsin legislative bill records are available. Wis-

consin Legislative Informational Bulletin, 80–1B–6, *How Can the L.R.B. Help You?*, p. 10 (1980). The majority errs, however, in concluding that "there is no legislative history available to guide us in our interpretation of this statute." (*Supra,* p. 380) The legislative history is that of the Uniform Act adopted by the National Conference of Commissioners on Uniform State Laws in 1916. Since the Wisconsin law is identical to that passed by the Conference, the notes from the Conference and the experience of other states may assist this court in its interpretation of secs. 51.81–51.85, Stats. 1979–80. I turn to the legislative history of the Uniform Act.

The legislative history of the Uniform Act shows that the purpose of the Act is to protect the interest of the mental patient. In 1915 a special committee of the National Conference of Commissioners on Uniform State Laws reported on its consideration of a uniform law providing for the return, upon a governor's demand, of a mentally ill person who had fled a state or had been removed from a state. Proceedings of the 25th Annual Meeting of the National Conference of Commissioners on Uniform State Laws, p. 225 (1915). The statement of the special committee's chairman, accompanying the presentation of the committee report to the conference in 1915, demonstrates that the drafters' concern was with the protection of the interest of the mental patient. *Id.* at 66–67. Totally absent from the committee's report is any indication that the objective of the law is to protect the interest of the extraditing state, here California, in maintaining control over the person. Nor was there any indication that the Uniform Act was designed to protect any interest of the state where the mentally ill person is found, here Wisconsin, whether that state viewed its interest as protecting its citizens from any danger that might be posed by the mentally ill person or as protecting its citizens from incurring the costs for the care of the mentally ill person.

The 1915 Conference requested the committee to consider the proposed Act further and to report it at the next meeting of the Conference. When the commissioners met again, in 1916, the spokesman presented the proposed Act and stated, "There is no change in principle of any kind." Proceedings of the 26th Annual Meeting of the National Conference of Commissioners on Uniform State Laws, p. 91 (1916). Following the Conference's approval, the Uniform Act was referred to the state legislatures for adoption.

The Uniform Act for the Extradition of Persons of Unsound Mind was subsequently adopted by the legislatures of eleven states, including Wisconsin's in 1919. One state did not enact the one-year statute of limitations.

The patient's interest to be protected by the Uniform Act is the interest to receive treatment in the least restrictive setting and only as long as necessary, and the cardinal rule in interpreting a statute is to achieve a reasonable construction which will effect the statute's purpose.

This Uniform Act, unlike the usual extradition statute, establishes a time limitation within which to commence the extradition proceedings. A period of repose is granted to a fugitive mental patient but not to a fugitive criminal. There is a simple explanation for granting repose to the mental patient. A significant aspect of all statutes relating to commitment to a mental institution is that the person committed is entitled to periodic reevaluation to determine whether he or she has made sufficient progress to warrant discharge.

When the Wisconsin legislature adopted the Uniform Act in 1919, sec. 51.11, Stats. 1919, provided for reevaluation, and sec. 51.13, Stats. 1919, provided that if the superintendent of an institution permitted the mental patient "to go at large," upon the expiration of two years after granting such leave of absence, the superintendent

lost authority to require the person to return to the institution, and the person "shall be presumed sane the same as though his sanity had been established by a judicial determination."

The theory in the mental health laws (as early as 1919) is that the person's condition can change. The underlying assumption in the laws is that the person will regain his or her sanity over time, and that care must be taken to free the person as soon as he or she is sane.

Given the rarity of a statute of limitations in extradition and given the recurring theme in the mental health laws that the mentally ill person gets better, the statute of limitations in sec. 51.84 should be construed to cut off promptly the extraditing state's power to force the person to return. The only reasonable interpretation of the statute of limitations is that the drafters of the Uniform Act determined that if the return of the fugitive was not begun within one year of his or her departure, that is, within one year from the time that he or she escaped from the control of the state, he or she should not be returned involuntarily.

The majority says that the statute of limitations should be liberally construed to effectuate the purpose of the Act which is the "return of *those in the need of treatment* to the place of original commitment where they were receiving such treatment." (Emphasis supplied). (*Supra,* p. 381) The majority does not explain how Wisconsin is to determine under the Uniform Act that the person is in need of treatment. There is no provision allowing Wisconsin to make this determination. I believe that the statute of limitations in the Uniform Act, in effect, sets up a presumption that if the person has been out of the control of the extraditing state for more than a year, the person can no longer be viewed as needing treatment and should not be extradited. The Uniform Act recognizes the changing conditions of mentally

ill persons and has a built-in fail-safe device easily applied.

The interpretation of the Uniform Act which I set forth is consistent with the only reported case interpreting a statute similar to ours. Apparently the Uniform Act is so infrequently used that it has been interpreted only once in 66 years.

In *In re Chaffee*, 211 Tenn. 88, 362 S.W.2d 467 (1962), Mrs. Chaffee had been adjudged *non compos* by a Florida court on October 4, 1960, had been discharged from a Florida hospital on March 31, 1961, and had moved to Tennessee. Florida had made no express judicial or administrative determination of her sanity upon her discharge. On August 13, 1962, Mrs. Chaffee petitioned a Tennessee trial court for a decree finding that she had been restored to sanity. The trial court held that it did not have jurisdiction because a person adjudged a *non compos mentis* was a ward of the court making that determination and that Mrs. Chaffee remained within the sole jurisdiction of the Florida court. In deciding the jurisdictional issue, the Tennessee Supreme Court considered the effect of the one-year statute of limitations in the Uniform Act for the Extradition of Persons of Unsound Mind which Tennessee had adopted. As the Tennessee court noted, the one-year statute of limitations was not enacted merely to be ignored. The Tennessee Supreme Court reasoned that the proceedings for the return of the person must be begun within one year after the person left the state; that during the one year in which the demanding state has the right to demand the return of the mental patient, the court in the demanding state is the only court with jurisdiction over the person and the only state with power to enter a decree restoring the adjudged *non compos* to sanity; and that after that year ends, the demanding state loses jurisdiction over the person. The Tennessee Supreme

Court reasoned that the Uniform Act was an enactment for the benefit of the adjudged *non compos* and that if the person is required to return to the state of commitment after the one year ends the Act is not being applied for the mental patient's benefit.

The second aspect of the legislative history of the Uniform Act which has bearing on our interpretation of the statute of limitations is that the Uniform Act was withdrawn in 1954 as obsolete by the National Conference of Commissioners on Uniform State Laws, the drafters and proponents of the Act. Proceedings of the 63rd Annual Meeting of the National Conference of Commissioners on Uniform State Laws, p. 279 (1954). There is no explanation in the Conference's proceedings for the withdrawal of the Act and there is no explanation in the records in the national office of the National Conference of Commissioners on Uniform State Laws as to the reasons for the withdrawal (telephone conference on June 25, 1982). The parties were able to cite to the court only one case involving the Uniform Act, and our research has found no additional cases. In all probability, the minimal use of the Act, as evidenced by the lack of reported cases, as well as the adoption of the Interstate Compact on Mental Health, and other statutes similar to Wisconsin's Mental Health Act (ch. 51, Stats. 1979–80) which seek to assure treatment and rehabilitation of the mentally ill in the least restrictive treatment environments, resulted in the withdrawal of the Uniform Act as obsolete.

Although I do not suggest that "the long desuetude of any law amounts to its repeal," *James v. Commonwealth*, 12 Serg. & R. 220, 228 (Pa. 1824), quoted in 1A Sutherland, *Statutory Construction*, sec. 23.25, p. 267 (1973), I do suggest that the declaration of obsolescence by the Commissioners should influence this court to adopt an interpretation of the Act which limits, not

extends, the application of the Act. The reasonable and less expansive interpretation of the Act is to construe "flight" to mean the moment of departure from the authority of the state and to treat the one-year statute of limitations in this case as beginning to run from the moment the person left the state institution.

While the concerns the majority expresses for the welfare of Mr. Melentowich and those similarly situated may be genuine, Mr. Melentowich may very well feel that with friends like the majority, who needs enemies. Mr. Melentowich is presently living with his mother in Wisconsin, and as a result of a prior determination of the Waukesha county circuit court (which determination was not appealed) and the determination of Wisconsin physicians, Mr. Melentowich is receiving outpatient treatment at Northview Hospital in this state. On the basis of the record before this court, the interest of Mr. Melentowich appears to be that he remain in this state. Mr. Melentowich's remaining in the state is in harmony with sec. 51.001, the legislative statement of the mental health policy of this state. The legislature of this state has stated that it intends to provide a unified system of mental health care to assure "all people in need of care access to the least restrictive treatment alternative appropriate to their needs," sec. 51.001(1), and to protect the personal liberties of persons with mental illness so that if a person can be treated outside of an institution, that person should not be treated involuntarily in an institution. Sec. 51.001(2).

Because the majority's interpretation and holding do not comport with either the Uniform Act or the legislative policy of this state, I dissent.

I am authorized to state that Justice NATHAN S. HEFFERNAN joins this dissent.