853 F.2d 721
 57 USLW 2148
 COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellee,
v.
P.I.E., INC. dba: Paragon Investments; Marvin D. Brandon,
Defendants- Appellants,
and
Jack L. Christian, Jr., Defendant.
COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellee,
v.
P.I.E., INC. dba: Paragon Investments; Jack L. Christian,
Jr., Defendants,
and
Marvin D. Brandon, Defendant-Appellant.
 Nos. 86-6374, 87-5581.
 United States Court of Appeals,
Ninth Circuit.
 Submitted June 8, 1988.*
Decided Aug. 3, 1988.
 
 Lee Allen Johnson, Phoenix, Ariz., for defendants-appellants.
 Edward S. Geldermann, Asst. Gen. Counsel, Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before TANG, FARRIS and KOZINSKI, Circuit Judges.
 BACKGROUND
 FARRIS, Circuit Judge:
 
 
 1
 From January 1985 until July 1986, Paragon Investments offered and sold contracts for the future delivery of precious metals. Paragon solicited orders through advertisements in nationally circulated newspapers, the mails, and phone calls. In doing so, Paragon engaged in various deceptive and fraudulent practices that allowed it to bilk investors out of nearly $500,000 over an eighteen-month span.
 
 
 2
 After learning of Paragon's activities, the Commodity Futures Trading Commission initiated this action against Paragon and its sole shareholder, Marvin Brandon. The Commission alleged that Paragon was selling commodity futures contracts that could only be sold on or subject to the rules of a Commission-designated market. See 7 U.S.C. Sec. 6 (1982). The Commission also alleged that Paragon had engaged in numerous deceptive and fraudulent practices that were prohibited by the Commodity Exchange Act. See id., Sec. 6b. The district court agreed with the Commission and 1) permanently enjoined Paragon and Brandon from marketing off-exchange futures contracts 2) appointed a permanent equity receiver of all of Paragon's property 3) permanently enjoined Paragon and Brandon from deceiving or defrauding the public in the sale of futures contracts, and 4) ordered Brandon to disgorge $496,495.39 in illegal profits.
 
 
 3
 On appeal, Paragon and Brandon contend that they were not selling futures contracts, but leverage contracts that could be sold directly to the public. Brandon also contends that even if Paragon had sold futures contracts, the Commodity Exchange Act's prohibition against deceptive and fraudulent practices applied only to sales made on or subject to the rules of a designated market, and not to sales made directly to the public. Finally, Brandon contends that the disgorgement order is improper because it essentially awards a money judgment to the Commission and does not allow Brandon to spend any of his resources for necessary living expenses. We affirm in part and modify the disgorgement order so that Brandon may petition the district court from time to time for ordinary and necessary living expenses.
 
 DISCUSSION
 A. Futures contract or leverage contract
 
 4
 The Paragon contracts provided a means for investors to speculate in the precious metals market. Customers dealt directly with Paragon, choosing a type and quantity of metal and then deciding whether delivery would be deferred for 90, 180, or 360 days. Paragon set the price by reference to the current market price of the metal for immediate delivery, plus a 3% commission and a surcharge. Customers paid a 15% deposit up front and made margin payments at Paragon's behest if the price of the metal declined during the term of the contract. Customers rarely took delivery of the metal. Instead they sold their rights to the metal back to Paragon, which then settled the customers' respective accounts.
 
 
 5
 The Paragon contracts can only be classified in one of two ways: they are either futures contracts or leverage contracts. The two are not readily distinguishable. In 1982, for example, the Chairman of the Commodity Futures Trading Commission stated that "differing opinions exist over the nature of leverage contracts and their distinction, if any, from futures contracts even though they are off-exchange instruments." H.R.Rep. No. 565, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Ad.News 3871, 3963. Despite the difficulty in distinguishing the two, Congress amended the Commodity Exchange Act in 1982 to ensure that the Commission would regulate leverage contracts as a separate class of transactions. See H.R.Conf.Rep. No. 964, 97th Cong., 2d Sess. 51, reprinted in 1982 U.S.Code Cong. & Ad.News 4055, 4068-69 (discussing purposes of Sec. 234 of Futures Trading Act of 1982).
 
 
 6
 In amending the Act, however, Congress recognized "the Commission's authority under existing law to define the term[ ] ... leverage contract...." Id. at 4069. In 1984, the Commission determined that one definitional requirement of a leverage contract was that the contract must be for a duration of ten or more years. 49 Fed.Reg. 5498 (1984); 17 C.F.R. Sec. 31.4(w)(1) (1987). Paragon and Brandon agree that the contracts which they sold did not meet this requirement because the contracts provided for delivery of the metals either 90, 180, or 360 days after the contract was executed. They argue, however, that the definition is invalid because it ignores Congress's directive that the definition should be based on ordinary trade usage. We reject the argument.
 
 
 7
 In June 1983, the Commission solicited comments on its proposed definition of "leverage contract." The proposal included the ten-year durational requirement. 48 Fed.Reg. 28668 (1983). Some commentators objected to the requirement, claiming that it was "inconsistent with the customary practices of the leverage industry and with the legislative history underlying the Commission's authority over leverage contracts." 49 Fed.Reg. 5499 (1984). The Commission disagreed, stating that
 
 
 8
 as the legislative history and other evidence indicates, leverage contracts as commonly known to the trade have traditionally been long-term contracts of at least [ten years] duration. This view is supported by congressional testimony which emphasized the long-term nature of leverage contracts presented by persons themselves claiming to be involved in the leverage business. (citations omitted).
 
 
 9
 Id.
 
 
 10
 We give great deference to the Commission's interpretation of the Commodity Exchange Act. Lawrence v. C.F.T.C., 759 F.2d 767, 772 (9th Cir.1985). Because there is some basis for the Commission's position that the durational requirement comports with ordinary trade usage, we decline to invalidate the Commission's definition of "leverage contract." The contracts sold by Paragon therefore cannot be treated as leverage contracts.
 
 
 11
 We reject the contention that the Commission intended only to regulate a subset of leverage contracts, leaving regulation of contracts of a shorter duration to the states. Congress granted the Commission exclusive jurisdiction over the regulation of leverage contracts and has rejected bills that would have granted the states a regulatory role in this area. See, e.g., S.Rep. No. 384, 97th Cong.2d Sess. 52 (1982). Moreover, the Commission itself never intended to regulate only a subset of leverage contracts. After the Commission adopted the definition of "leverage contract," the Commission stated that
 
 
 12
 [V]arious instruments which call for the future delivery of commodities and which do not meet the definition of a "leverage contract" as contained in the Commission's interim final leverage regulations, are commodity futures contracts.
 
 
 13
 50 Fed.Reg. 11656 (1985).
 
 
 14
 Under the Commission's interpretation of the Commodity Exchange Act, there can be no such thing as a leverage contract with a duration of less than ten years. The Paragon contracts therefore were not a subset of leverage contracts left unregulated by the Commission, but futures contracts. Paragon sold the contracts directly to the public instead of on or subject to the rules of a designated market. We affirm the district court's holding that the contracts were sold in violation of 7 U.S.C. Sec. 6 (1982).
 
 
 15
 B. Applicability of 7 U.S.C. Sec. 6b to Off-Exchange Sales
 
 
 16
 The district court found that Paragon and Brandon violated 7 U.S.C. Sec. 6b by defrauding and willfully deceiving customers. Brandon does not challenge the evidentiary bases of these findings. Instead, he argues that even if Paragon sold futures contracts, the version of section 6b in effect at the time of the sales applied only to fraud connected with sales made on designated exchanges, and not to sales made directly to the public. He acknowledges that after the complaint was filed Congress amended section 6b to reach off-exchange sales, but argues that the district court erred by applying the amended version of the provision to him.
 
 
 17
 In Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270 (9th Cir.1979), we faced a similar situation. During the relevant period in that case, the antifraud provisions of 7 U.S.C. Sec. 6o applied to commodity trading advisors "registered under the Act...." 611 F.2d at 281. The defendant was a trading advisor who had engaged in fraudulent practices but who had not registered under the Act. After the Commission initiated an action against him, Congress amended section 6o to clarify that the provision applied to trading advisors who should have been registered under the Act. Id.
 
 
 18
 After looking to the legislative history of the 1978 amendments to the Act and the underlying purposes of the Act, we concluded that the unamended version of section 6o applied to Savage.
 
 
 19
 The fact that Congress deleted "registered under this Act" might suggest that a gap in the law existed prior to amendment. We consider the amendment to be a clarification, however. The purpose of the statute supports this interpretation of congressional intent. It would be anomolous indeed if an advisor could escape the fiduciary duties of section [6o] by avoiding required registration. This would frustrate a principal purpose of the Act.
 
 
 20
 Id. at 282.
 
 
 21
 The legislative history of the amended version of 6b makes clear that Congress was not filling a gap in section 6b, but clarifying the meaning of it. The report by the Senate Committee on Agriculture, Nutrition, and Forestry, for example, noted that
 
 
 22
 Since Congress has historically confirmed that all futures trading must take place on designated exchanges, it would be anomolous if section [6b] were read narrowly, so as not to apply to the sale of unlawful futures contracts. The amendment, however, removes all doubt as to the applicability of section [6b].
 
 
 23
 S.Rep. No. 291, 99th Cong.2d Sess. 5 (1986).
 
 
 24
 The report from the House Committee on Agriculture also indicates that the amendment to section 6b was intended to clarify the meaning of section 6b.
 
 
 25
 [T]he current language of section [6b] could be interpreted narrowly to limit its authority to exchange-traded futures, resulting in a court's refusal to apply section [6b] to the sale of off-exchange futures contracts. The proposed amendment would simply codify the Commission's interpretation of section [6b] and make it consistent with other antifraud provisions of the Act and Commission rules, which are not limited to transactions conducted on a contract market.
 
 
 26
 H.R.Rep. No. 624, 99th Cong.2d Sess 9 (1986), 1986 U.S.Code Cong. & Ad.News 6005, 6009; see also id. at 5.
 
 
 27
 We recognize that as a general rule a court should not look beyond a statute if its meaning is plain. An exception to that rule of construction arises when a literal reading of the statute would thwart the underlying purposes of the statutory scheme or lead to an absurd result. See, e.g., Bob Jones University v. United States, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983); Brothers v. First Leasing, 724 F.2d 789, 793 (9th Cir.1984); Brooks v. Donovan, 699 F.2d 1010, 1011 (9th Cir.1983). That exception applies here. The Act requires futures contracts to be sold on a designated market. Sales on these markets enable the Commission to regulate the transactions to protect investors. Paragon violated the Act by selling futures contracts directly to the public. By doing so, Paragon avoided direct supervision by the Commission, thus facilitating a scheme to defraud investors. Because Paragon proceeded in this manner, Brandon argues that Paragon and Brandon should not have to answer for the fraud perpetrated on investors because the original version of section 6b applied only to sales made on designated markets. We understand but reject the argument. It is obviously at odds with the underlying purposes of the Act. The Act requires futures sales to be made on a designated market in order to protect investors. Paragon and Brandon cannot illegally avoid sales on these markets and then argue that because they did so they need not answer for a fraud perpetrated on investors. We hold that the unamended version of section 6b applied to Paragon's off-exchange sales.
 
 C. The Disgorgement Order
 
 28
 The district court ordered Brandon to disgorge $496,495.29 in illegal profits to Paragon's trustee in Chapter 11 bankruptcy. The order gave the trustee the rights of a judgment creditor on behalf of the bankrupt's estate.
 
 
 29
 Brandon first argues that the Commission had no standing to seek a disgorgement order on behalf of investors. In Commodity Futures Trading Comm'n v. Co Petro, 680 F.2d 573, 583-84 (9th Cir.1982), we recognized that the district court's inherent equitable power allows the court to issue a disgorgement order in favor of the Commission.
 
 
 30
 Brandon next argues that the district court abused its discretion by giving the trustee status as a judgment creditor, thus allowing the trustee to reach Brandon's future earnings and subsequently acquired property. These items, he contends, are not tied to the illegal conduct in this case and therefore should not be subject to seizure.
 
 
 31
 The district court has broad powers to afford complete relief. Id. at 584. The money that Brandon withdrew from Paragon is either no longer available to the trustee or cannot be easily traced. To afford complete relief and to deter Brandon from committing future violations under the Act, the district court could properly allow the trustee to reach Brandon's future earnings and subsequently acquired property.
 
 
 32
 Brandon finally argues that the district court abused its discretion because the order forbids him from spending any resources to support himself. The original draft of the order allowed Brandon to petition the court from time to time for ordinary and necessary living expenses. The court later modified the order and deleted the portion allowing Brandon to petition for living expenses. This may have been a clerical error but we modify the disgorgement order to reinstate the language permitting Brandon to petition the district court from time to time for ordinary and necessary living expenses.
 
 
 33
 AFFIRMED AS MODIFIED.
 
 
 34
 KOZINSKI, Circuit Judge, concurring in part and dissenting in part.
 
 
 35
 I concur in Part A of the majority opinion which affirms the district court's finding that defendants violated 7 U.S.C. Sec. 6(a) (1982). I dissent from Parts B and C imposing liability and providing a remedy for violations of 7 U.S.C. Sec. 6b (1982).
 
 
 36
 During the entire period in which the defendants were selling the contracts that gave rise to this lawsuit, the Commodity Exchange Act provided:
 
 
 37
 It shall be unlawful ... (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person ... (A) to cheat or defraud or attempt to cheat or defraud such other person; [or] (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract....
 
 
 38
 7 U.S.C. Sec. 6b (1982) (emphasis added).[1] The Commission's complaint in this case tracks this statutory language by alleging that Paragon and Brandon committed fraud in connection with transactions "made, or to be made, on or subject to the rules of a contract market." Complaint, Excerpt of Record tab 1, at 15, p 36 (Second Claim for Relief); id. at 16, p 38 (Third Claim for Relief). None of Paragon's fraudulent transactions with its customers was "made, or to be made, on or subject to the rules of a contract market." Since neither the statute nor the complaint covered defendants' conduct, I can see no way around reversing the district court's judgment in favor of the Commission on its second and third claims for relief.
 
 
 39
 The majority reaches a contrary conclusion in part because it believes that permitting these defendants to escape liability would be "at odds with the underlying purposes of the Act." Majority Op. at 726. While it is no doubt true that in construing a particular phrase of a statute we must " 'take in connection with it the whole statute ... and the objects and policy of the law,' " Bob Jones University v. United States, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983) (quoting Brown v. Duchesne, 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595 (1857)), I don't believe this rule of construction permits us to go so far as to ignore an entire statutory clause merely because the congressional purpose in enacting the legislation would have been better served if only the clause had been omitted. Congress has given us an explicit and unambiguous statutory command; it does not lead to an absurd result; I would follow it.
 
 
 40
 The majority's reliance on the subsequent amendment of the statute is similarly misplaced. While the legislative history of this amendment does indicate it was intended merely to "clarify" the scope of section 6b, see Majority Op. at 725. I question the authority of a congressional committee to declare that an earlier Congress did not mean what it said when it adopted statutory language expressly limiting the scope of its regulatory scheme. See Weinberger v. Rossi, 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715 (1982); Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 & n. 13, 100 S.Ct. 2051, 2061 & n. 13, 64 L.Ed.2d 766 (1980); United States v. Southwestern Cable Co., 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968); Rainwater v. United States, 356 U.S. 590, 593, 78 S.Ct. 946, 949, 2 L.Ed.2d 996 (1958). The interpretation urged on us by the Commission is not a mere matter of giving a different reading to statutory language; under the Commission's proffered interpretation we would have to deny all meaning to the statutory phrase at issue. It is a fundamental canon of statutory construction that statutes are to be construed, if possible, to give effect to all their parts. See, e.g., Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985); Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979); Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973); Nieto v. Ecker, 845 F.2d 868, 873 (9th Cir.1988). I perceive no impossibility in following this common sense command.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 [1]
 The emphasized portion of the quoted language was deleted in 1986, four months after the complaint was filed in this case. See Act of Nov. 10, 1986, Pub.L. No. 99-641, Sec. 101(1), 100 Stat. 3556, 3557 (1986)